Slip Op. 18-47

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JACOBI CARBONS AB AND JACOBI CARBONS, INC.,<br>　　　　　　Plaintiffs,<br><br>and<br><br>NINGXIA HUAHUI ACTIVATED CARBON CO., LTD., et al.,<br>　　　　　　Plaintiff-Intervenors,<br><br>v.<br><br>UNITED STATES,<br>　　　　　　Defendant,<br><br>and<br><br>CALGON CARBON CORP. AND CABOT NORIT AM., INC,<br>　　　　　　Defendant-Intervenors. | Before: Mark A. Barnett, Judge<br>Consol. Court No. 16-00185<br><br>**PUBLIC VERSION** |

## OPINION AND ORDER

[Sustaining Commerce's determination with respect to economic comparability. Remanding Commerce's determinations with respect to significant production of comparable merchandise, surrogate value selections, and the irrecoverable value added tax adjustment.]

Dated: April 19, 2018

Daniel L. Porter and Tung A. Nguyen, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, argued for Plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc.

Gregory S. Menegaz and Alexandra H. Salzman, DeKieffer & Horgan PLLC, of Washington, DC, argued for Plaintiff-Intervenors Carbon Activated Corporation, Ningxia Mineral and Chemical Ltd., Shanxi DMD Corp., Shanxi Industry Technology Trading

Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tianjin Channel Filters Co. Ltd., and Tianjin Maijin Industries Co., Ltd.  With them on the brief was J. Kevin Horgan.

Lizbeth R. Levinson and Ronald M. Wisla, Fox Rothschild, LLP, of Washington, DC, for Plaintiff-Intervenor Ningxia Huahui Activated Carbon Co., Ltd.

Francis J. Sailer, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for Plaintiff-Intervenors Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd, Beijing Pacific Activated Carbon Products Co., Ltd., and Datong Municipal Yunguang Activated Carbon Co., Ltd.

William E. Perry, Emily Lawson, and Adams C. Lee, Harris Bricken McVay, LLP, of Seattle, WA, for Plaintiff-Intervenors M.L. Ball Company, Ltd., and Jilin Bright Future Chemical Company, Ltd.

Mollie L. Finnan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.[1]  With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director.  Of counsel on the brief was Emma T. Hunter, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

R. Alan Luberda and Melissa M. Brewer, Kelley Drye & Warren LLP, of Washington, DC, argued for Defendant-Intervenors Calgon Carbon Corp. and Cabot Norit Americas, Inc.  With them on the brief were John M. Herrmann and David A. Hartquist.

    Barnett, Judge:  Plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc. (together,

"Jacobi") and Plaintiff-Intervenors[2] (collectively, "Plaintiffs") challenge the United States

---

[1] Antonia R. Soares, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant on the issue of irrecoverable value added tax.  Ms. Soares is counsel of record for Defendant in *Jacobi Carbons AB v. United States*, Consol. Ct. No. 15-00286.

[2] Plaintiff Intervenors include Carbon Activated Corporation, Ningxia Mineral and Chemical Limited, Shanxi DMD Corporation, Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tianjin Channel Filters Co., Ltd., and Tianjin Maijin Industries Co., Ltd. (collectively, "CAC"); Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd., and Datong Municipal Yunguang Activated Carbon Co., Ltd (collectively, "Cherishmet"); Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui"); and M.L. Ball Co., Ltd., and Jilin Bright Future Chemical Company, Ltd. (together, "M.L. Ball").

Department of Commerce's ("Commerce" or the "agency") final results in the eighth

administrative review ("AR8") of the antidumping duty order ("AD Order") on certain

activated carbon from the People's Republic of China ("PRC" or "China").  *See Certain*

*Activated Carbon from the People's Republic of China,* 81 Fed. Reg. 62,088 (Dep't of

Commerce Sept. 8, 2016) (final results of antidumping duty admin. review; 2014-2015)

("*Final Results*"), ECF No. 44-4, and accompanying Issues and Decision Mem., A-570-

904 (Aug. 31, 2016) ("I&D Mem."), ECF No. 44-5, as amended by the Final Results of

Redetermination Pursuant to Court Order (Sept. 1, 2017) ("Remand Results"), ECF No.

78-1.[3]

Plaintiffs challenge Commerce's selection of Thailand as the primary surrogate

country and Thai surrogate values for carbonized material, hydrochloric acid, coal tar,

and financial ratios; and Commerce's adjustment to Jacobi's constructed export price

("CEP") to account for irrecoverable value added tax ("VAT").  *See* Confidential Consol.

Pls. Jacobi Carbons AB and Jacobi Carbons, Inc.'s Mot. for J. Upon the Agency R. and

Br. in Supp. of Mot. for J. on the Agency R. ("Jacobi Rule 56.2 Mem."), ECF No. 48;

---

[3] The administrative record is divided into a Public Administrative Record ("PR"), ECF
No. 44-3, and a Confidential Administrative Record ("CR"), ECF No. 44-2.  The
administrative record associated with the Remand Results is contained in a Public
Remand Record, ECF No. 79-2.  Parties submitted joint appendices containing record
documents cited in their briefs.  *See* Public Joint App. ("PJA"), ECF No. 92; Confidential
Joint App. ("CJA"), ECF No. 91; Remand Joint App. ("RJA"), ECF No. 95.  Parties also
submitted supplemental appendices upon the court's request.  *See* Confidential
Submission of Admin. R. Docs. ("Suppl. CJA"), ECF No. 103; Evidence Presented at
Oral Arg. ("Suppl. PJA"), ECF No. 104; Confidential Def.'s Filing of Admin. R. Evidence
Discussed at Oral Arg., ECF No. 105.  The court references the confidential versions of
the relevant record documents, if applicable, throughout this opinion, unless otherwise
specified.

Consol. Pls. Carbon Activated Corporation, Ningxia Mineral and Chemical Limited,

Shanxi DMD Corporation, Shanxi Industry Technology Trading Co., Ltd., Shanxi

Sincere Industrial Co., Ltd., Tianjin Channel Filters Co., Ltd., and Tianjin Maijin

Industries Co., Ltd. Mot. for J. on the Agency R., ECF No. 51, and Mem. in Supp. of

Mot. for J. on the Agency R. ("CAC Rule 56.2 Mem."), ECF No. 53; Pl.-Ints.' Ningxia

Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon

Products Co., Ltd., and Datong Municipal Yunguang Activated Carbon Co., Ltd Mot. for

J. on the Agency R. and Br. in Supp. of Mot. for J. on the Agency R. ("Cherishmet Rule

56.2 Mem."), ECF No. 55;[4] Pl.-Int. Ningxia Huahui Activated Carbon Co., Ltd.'s Mot. for

J. on the Agency R. ("Huahui Rule 56.2 Mot."), ECF No. 56;[5] Pl.-Ints.' M. L. Ball Co.,

Ltd., and Jilin Bright Future Chemical Company, Ltd. Mot. for J. on the Agency R. and

Br. in Supp. ("M.L. Ball Rule 56.2 Mem."), ECF No. 57.  For the following reasons,

Commerce's *Final Results*, as amended by the Remand Results, will be sustained with

respect to economic comparability, but remanded in all other respects.

## BACKGROUND

In May 2015, Commerce initiated this eighth administrative review of the AD

Order on certain activated carbon[6] from the PRC.  *Initiation of Antidumping and*

---

[4] Cherishmet adopted Jacobi's arguments concerning surrogate values and presented additional arguments concerning the VAT deduction.  *See* Cherishmet Rule 56.2 Mem. at ii-v.

[5] Huahui adopted Jacobi's arguments as to all issues.  *See* Huahui Rule 56.2 Mem. at 2.

[6] Generally speaking, certain activated carbon consists of "a powdered, granular, or pelletized carbon product obtained by 'activating' with heat and steam various materials containing carbon, including but not limited to coal (including bituminous, lignite, and anthracite), wood, coconut shells, olive stones, and peat."  *See* Decision Mem. for the

*Countervailing Duty Administrative Reviews*, 80 Fed. Reg. 30,041 (Dep't Commerce

May 26, 2015), CJA Tab. 30, PR 18, ECF No. 92-4.  The period of review ("POR") ran

from April 1, 2014 to March 31, 2015.  *Id.* at 30,043.  Commerce selected Jacobi and

Datong Juqiang Activated Carbon Co., Ltd. ("DJAC") as mandatory respondents in the

review.  Prelim. Mem. at 2-3.

     In March 2016, Commerce issued its preliminary results.  *Certain Activated

Carbon From the People's Republic of China*, 81 Fed. Reg. 11,513 (Dep't Commerce

Mar. 4, 2016) (preliminary results of antidumping duty administrative review; 2014–

2015) ("*Prelim. Results*"), PJA Tab 38, PR 377, ECF No. 92-6.  Commerce preliminarily

determined that Mexico, Romania, Bulgaria, South Africa, Ecuador, and Thailand were

at the same level of economic development as the PRC and, pursuant to its practice,

treated each country as equally economically comparable.  Prelim. Mem. at 13; Req. for

Economic Development, Surrogate Country and Surrogate Value Comments and

Information (Aug. 7, 2015) ("Surrogate Country Ltr"), Attach. 1, PJA Tab 20, PR 104,

ECF No. 92-3.  Commerce also determined that two proposed countries—Malaysia and

the Philippines—were not at the same level of economic development as the PRC.  *Id.*

at 15.  Commerce further determined that Ecuador, Mexico, Romania, South Africa, and

Thailand had "significant exports" of the subject merchandise based on data published

by the Global Trade Atlas ("GTA") and were, therefore, "significant producers of

_____

Prelim. Results of Antidumping Duty Admin. Review: Certain Activated Carbon from the
People's Republic of China; 2014-2015 ("Prelim. Mem.") at 3, PJA Tab 27, PR 365,
ECF No. 92-4; *see also id.* at 3-4 (describing the scope of the merchandise subject to
the AD Order).

comparable merchandise" pursuant to 19 U.S.C. § 1677b(c)(4)(B).  *Id.* at 14-15.

Because data considerations favored Thailand, Commerce preliminarily selected

Thailand as the primary surrogate country.  *Id.* at 15-16.  Commerce subsequently

relied on Thai data to supply surrogate values for all factors of production, except

anthracite coal.[7]  *Id.* at 15-16, 23-26; Surrogate Values for the Prelim. Results (Feb. 26,

2016) ("Prelim. Surrogate Value Mem.") at 4-11, PJA Tab 9, PR 367, 369, ECF No. 92-

2.  Commerce also reduced Jacobi's and DJAC's constructed export price and DJAC's

export price by 17 percent pursuant to the agency's irrecoverable VAT adjustment.

Prelim. Mem. at 21-22.  Commerce preliminarily assigned Jacobi and DJAC weighted-

average dumping margins of $2.80/kilogram ("kg") and $0.29/kg, respectively, and

assigned those companies demonstrating eligibility for a separate rate[8] a weighted-

average dumping margin of $2.22/kg.[9]   *Prelim. Results* at 11,514.

Commerce issued its final results in September 2016.  *Final Results*, 81 Fed.

Reg. 62,088.  Commerce continued to rely on Thailand as the primary surrogate

country, but made several changes to its surrogate value selections.  I&D Mem. at 4-5,

14.  Relevant here, with respect to Commerce's surrogate value for Jacobi's carbonized

---

[7] Commerce preliminarily relied on Mexican data to value anthracite coal because the
Thai data reflected "significant volatility" over a four-year period when compared with
surrogate value data from other countries on its surrogate country list.  Prelim. Mem. at
25-26.
[8] Commerce has a "rebuttable presumption that all companies within the PRC are
subject to government control and, thus, should be assessed a single antidumping duty
rate."  Prelim. Mem. at 5.  Companies that "affirmatively demonstrate an absence of
government control, both in law (de jure) and in fact (de facto), with respect to [their]
exports," are eligible for a separate rate.  *Id.*
[9] Unless otherwise stated, all references to monetary amounts are in U.S. dollars.

material, Commerce removed "French imports reported in the Thai GTA data under HS ["Harmonized Schedule"] code 4402.90.10000 because the French imports [were] not coconut shell charcoal, but a charcoal used in animal feeds."  Surrogate Values for the Final Results (Aug. 31, 2016) ("Final Surrogate Value Mem.") at 2, PJA Tab 16, PR 427, 428, ECF No. 92-3; *see also* I&D Mem. at 30, 32-33.  That change yielded a reduced surrogate value for carbonized material in the amount of 17.3483 Thai Baht ("Baht")/kg. *Compare* Final Results Analysis Mem. for Jacobi Carbons AB (Aug. 31, 2016) ("Jacobi Final Results Mem.") at Attach. 1, CJA Tab 3, CR 333-334, PJA Tab 17, PR 432-433, ECF No. 91 *with* Jacobi Prelim. Analysis Mem., Attach. 1 (reflecting a preliminary value of 37.3127 Baht/kg), PJA Tab 10, PR 373, ECF No. 92-2.  Commerce further selected (1) Thai HS code 2706 ("Mineral Tars, Including Reconstituted Tars") to value Jacobi's coal tar input, which yielded a surrogate value of 60.9572 Baht/kg; (2) Thai HS code 2806.10.00102 ("Hydrochloric Acid 15% W/W To 36% W/W") to value Jacobi's hydrochloric acid ("HCL") input, which yielded a surrogate value of 77.4643 Baht/kg; and (3) the 2011 financial statement of Thai producer Carbokarn Co., Ltd. ("Carbokarn") to value Jacobi's financial ratios.  *See* I&D Mem. at 34, 39, 47; Jacobi Final Results Mem. at Attach. 1.  Commerce maintained its irrecoverable VAT adjustment, I&D Mem. at 7, and assigned Jacobi and DJAC respective weighted-average dumping margins of $1.7526/kg and $0.20/kg, *Final Results* at 62,089.  Commerce assigned the separate rate companies a weighted average dumping margin of $1.357/kg.  *Final Results* at 62,089.

On April 7, 2017, the court issued an opinion resolving challenges to Commerce's determination regarding the seventh administrative review ("AR7") of the AD Order on certain activated carbon.  *See Jacobi Carbons AB v. United States* ("*Jacobi (AR7) I*"), 41 CIT____, 222 F. Supp. 3d 1159 (2017).  The court remanded Commerce's determinations regarding economic comparability and significant production of comparable merchandise, as well as its irrecoverable VAT calculation, for reconsideration or further explanation.  *Id.* at 1165.  The court "defer[red] ruling on Plaintiffs' challenges to Commerce's surrogate value selections pending the results of the redetermination." *Id.*

In response to the court's decision, Commerce requested a remand of the instant determination so that it may clarify or reconsider its findings regarding economic comparability and Thailand's status as a significant producer of comparable merchandise.  Def.'s Mot. for a Voluntary Remand at 2-3, 4, ECF No. 72.  The court granted Commerce's request.  Order (June 20, 2017) ("Remand Order"), ECF No. 77.

On September 5, 2017, Commerce issued its redetermination.  *See generally* Remand Results.  Commerce further explained its determinations regarding economic comparability and significant production, and continued to rely on Thailand as the primary surrogate country.  Remand Results at 1-2.  CAC and Huahui oppose the Remand Results.  Consol. Pls. Carbon Activated Corporation, Ningxia Mineral and Chemical Limited, Shanxi DMD Corporation, Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tianjin Channel Filters Co., Ltd., and Tianjin Maijin Industries Co., Ltd. Comments in Opp'n to Remand ("CAC Remand Cmts"), ECF

No. 82; Notice of Pl.-Int.'s Statement of Supp. of Consol. Pls.' Comments in Opp'n to the

Remand Results, ECF No. 83.[10]  The Government and Defendant-Intervenors support

the Remand Results.  Def.'s Reply to Comments on the Remand Results ("Gov.

Remand Reply"), ECF No. 93; Def.-Ints.' Comments in Supp. of U.S. Dep't of

Commerce's Remand Redetermination ("Def.-Ints. Remand Reply"), ECF No. 94.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of 1930,

as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii)(2012),[11] and 28 U.S.C. § 1581(c)(2012).

The court will uphold an agency determination that is supported by substantial

evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*,

322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB.*, 305 U.S.

197, 229 (1938)).  It "requires more than a mere scintilla," but "less than the weight of

the evidence."  *Nucor Corp. v. United States*, 34 CIT 70, 72, 675 F. Supp. 2d 1340,

1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).

The court may not "reweigh the evidence or . . . reconsider questions of fact anew."

---

[10] CAC continues to oppose the court having remanded the case.  CAC Remand Cmts at 1-4.  In granting the voluntary remand, however, the court has resolved this argument in the Government's favor, and will not further address it.  *See* Remand Order.
[11] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and all references to the United States Code are to the 2012 edition, unless otherwise stated.

*Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015)

(citation omitted).

**DISCUSSION**

**I.    Relevant Legal Framework for Non-Market Economy Proceedings**

An antidumping duty is "the amount by which the normal value exceeds the

export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673.

When an antidumping duty proceeding involves a nonmarket economy country,

Commerce determines normal value by valuing the factors of production[12] in a

surrogate country, *see* 19 U.S.C. § 1677b(c)(1), and those values are referred to as

"surrogate values."  In selecting surrogate values, Commerce must use "the best

available information" that is, "to the extent possible," from a market economy country or

countries that are economically comparable to the nonmarket economy country and

"significant producers of comparable merchandise."  *Id.* § 1677b(c)(1), (4).[13]  In

selecting its surrogate values, Commerce generally prefers publicly-available and "non-

proprietary information from producers of identical or comparable merchandise in the

surrogate country."  19 C.F.R. § 351.408(c)(1),(4).  Commerce's practice "is to select

---

[12] The factors of production include, but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

[13] Because "best available information" is not statutorily defined, Commerce has "broad discretion" to determine what constitutes the "best available information."  *Qingdao Sea-Line Trading Co., Ltd. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014).  In other words, the court is "not to evaluate whether the information Commerce used was the best available, but" to determine "whether a reasonable mind could conclude that Commerce chose the best available information."  *Zhejiang DunAn Hetian Metal Co., Ltd. v. United States,* 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citation omitted).

[surrogate values] which, to the extent practicable, are product-specific, representative of a broad-market average, publicly available, contemporaneous with the POR, and exclusive of taxes and duties."  I&D Mem. at 24.

Commerce generally values all factors of production in a single surrogate country.[14]  Commerce has adopted a four-step approach to selecting a primary surrogate country.  *See* Import Admin., U.S. Dep't of Commerce, *Non-Market Economy Surrogate Country Selection Process*, Policy Bulletin 04.1 (2004), http://enforcement. trade.gov/policy/bull04-1.html (last visited Apr. 10, 2018) (hereinafter "Policy Bulletin 04.1").  Pursuant to Policy Bulletin 04.1,

> (1) the Office of Policy ("OP") assembles a list of potential surrogate countries that are at a comparable level of economic development to the [non-market economy] country; (2) Commerce identifies countries from the list with producers of comparable merchandise; (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (4) if more than one country satisfies steps (1)–(3), Commerce will select the country with the best factors data.

*Jiaxing Brother Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016) (citation omitted); Policy Bulletin 04.1.

When calculating export price and constructed export price, Commerce may deduct "the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the

---

[14] *See* 19 C.F.R. § 351.408(c)(2) (excepting labor).  *But see Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092 (Dep't Commerce June 21, 2011) (expressing a preference to value labor based on industry-specific labor rates from the primary surrogate country).

United States, other than an export tax, duty, or other charge described in section

1677(6)(C) of this title."[15]  19 U.S.C. § 1677a(c)(2)(B).  Such price adjustments must be

"reasonably attributable to the subject merchandise."  19 C.F.R. § 351.401(c).

      In 2012, Commerce reconsidered its unwillingness to apply § 1677a(c)(2)(B) to

certain non-market economy countries, including China,[16] and, henceforth, considers

whether the PRC "has imposed an export tax, duty, or other charge upon export of the

subject merchandise during the period of investigation or the period of review,"

including, for example, "an export tax or VAT that is not fully refunded upon

exportation."  *Methodological Change for Implementation of Section 772(c)(2)(B) of the*

*Tariff Act of 1930, as Amended, In Certain Non–Market Economy Antidumping*

*Proceedings*, 77 Fed. Reg. 36,481, 36,482 (Dep't Commerce June 19,

2012) ("*Methodological Change*") (internal quotation marks omitted).  If it has,

Commerce will "reduce the respondent's export price and constructed export price

accordingly, by the amount of the tax, duty or charge paid, but not rebated."  *Id.* at

36,483.  When the VAT is "a fixed percentage of the price," Commerce "will adjust the

export price or constructed export price downward by the same

percentage."  *Id.*  "[B]ecause these are taxes affirmatively imposed by the Chinese . . .

government[]," Commerce "presume[s] that they are also collected."  *Id.*

---

[15] Section 1677(6)(C), which concerns "export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received," is not relevant here.

[16] For a more detailed overview of Commerce's policy change with respect to nonmarket economies, see *Jacobi (AR7) I*, 222 F. Supp. 3d at 1184-85.

## II.    Surrogate Country Selection

In briefing the *Final Results*, CAC argued that Commerce should select the

Philippines as the primary surrogate country based on an evaluation of its economic

comparability, significant production, and data quality relative to Thailand's.  CAC Rule

56.2 Mem. at 8-18.[17]  CAC challenged Commerce's surrogate country selection

methodology, *id.* at 8-12, its specific finding that Thailand is a significant producer of

comparable merchandise, *id.* at 11, 12-14, and the superiority of Thai surrogate value

data for financial ratios and carbonized material, *id.* at 14-18.[18]  CAC's argument for the

Philippines as the primary surrogate country rested on its assertion that Commerce

should have weighed the country's relative fulfilment of the surrogate country criteria—

economic comparability, significant production of comparable merchandise, and data

quality—rather than excluding it from consideration on the basis of economic

comparability.  *Id.* at 10-12.

The court has previously found that Commerce's sequential methodology is a

reasonable means of implementing its surrogate country selection criteria, *see Jacobi*

*(AR7) I*, 222 F. Supp. 3d at 1171-75, and CAC offers nothing new to merit a different

outcome here.  That being said, however, Commerce's particular determinations vis-à-

vis economic comparability, significant production of comparable merchandise, and

surrogate value data must be supported by reasoned analysis and substantial evidence.

---

[17] No other plaintiffs challenged Commerce's primary surrogate country selection.

[18] The court addresses CAC's specific challenges to the reliability of Thai surrogate
values *infra* Section III.

*See Jiaxing Brother Fastener Co., Ltd.*, 822 F.3d at 1298.  Commerce's redetermination concerning economic comparability meets those requirements; however, Commerce's redetermination concerning significant production requires further consideration.[19]

### A. Economic Comparability

Section 1677b(c)(4)(A) does not define what is a comparable level of economic development or require a particular methodology to determine which countries are economically comparable.  *Jiaxing Brother Fastener Co., Ltd. v. United States*, 38 CIT ___,___, 961 F. Supp. 2d 1323, 1328 (2014), *aff'd*, 822 F.3d 1289.  Thus, "Commerce may perform its duties in the way it believes most suitable," provided, as noted above, its determinations are supported by reasoned analysis and substantial evidence. *Jiaxing Brother Fastener Co., Ltd.*, 822 F.3d at 1298 (internal quotation marks and citation omitted).  Commerce's redetermination meets those requirements.

On remand, Commerce explained its formulation of the GNI range generally, and in this proceeding specifically.  *See* Remand Results at 3-18.  Commerce relies on *per capita* gross national income ("GNI") data supplied by the World Bank's annual *World Development Report* to measure economic development.  *Id.* at 3.  Although the statute

---

[19] Because the court will also remand Commerce's surrogate value determinations, *see infra* Section III, Commerce's primary surrogate country selection remains an open question.  On remand, therefore, Commerce is not foreclosed from considering the Philippines in the event that none of the countries on Commerce's surrogate country list, including Thailand, are determined to be significant producers of comparable merchandise or provide suitable surrogate value data.  *See* Remand Results at 7; *id.* at 17-18 (noting that the Philippines is not "beyond consideration" as a surrogate country but is an inappropriate choice when Thailand meets Commerce's surrogate country criteria).

only requires Commerce to seek a surrogate market economy country whose economic

development is "comparable" to the subject nonmarket economy ("NME"), when

possible, the agency "selects a surrogate country at the *same* level of economic

development as the NME country."  Remand Results at 4; *id.* at 7 (explaining

Commerce's "general rule" to select a primary surrogate country that is at the same

level of economic development as the subject NME, unless none are significant

producers of comparable merchandise or provide suitable surrogate value data or they

are all unsuitable for other reasons).  Commerce considers those countries that occupy

a "relatively narrow *per capita* GNI range that is *centered* on the *per capita* GNI of the

NME country" to have attained the same level of economic development.  *Id.* at 4.[20]

Commerce's surrogate country selection process has developed in response to China's

"rapid economic growth," proceeding-specific issues and arguments, "the quality and

availability of [surrogate value] data," and judicial guidance.  *Id.* at 8.

The annual release of the *World Development Report* triggers Commerce's

reconsideration of potential surrogate countries.  *Id.* at 10.  Commerce compares

changes to China's *per capita* GNI to changes in the *per capita* GNI of its "existing set of

---

[20] Commerce likens *per capita* GNI ranges to a flight of stairs.  Remand Results at 5.
"[E]ach (flat) step . . . is associated with a [relatively narrow] range of *per capita* GNI,"
whereas "the staircase itself . . . is associated with a relatively broad range of *per capita*
GNI."  Remand Results at 5; *see also id.* at 6 (noting that Commerce defines each step
for each subject NME country "using a relatively narrow range of *per capita* GNI [that is]
centered on the country at issue").  The staircase metaphor demonstrates that a
country's level of economic development determines its location on a particular step,
and that "different countries can be at the same level of economic development, even if
their *per capita* GNIs differ, so long as those differences are small enough that one
stays on the same step."  *Id.* at 5.

surrogate countries" and, in light of "the PRC's rapid GNI growth rate," usually must re-center the list.  *Id.*  For example, in the 12 years before this administrative proceeding, China's *per capita* GNI grew almost 8 times, from $940 to $7,380. *Id.* at 10 & n.29 (citation omitted).  Each year, Commerce has, therefore, "reevaluated the [*per capita*] GNI range and expanded it at roughly the same rate."  *Id.* at 10; *see also id.* at 11, Table 1 (noting changes to China's *per capita* GNI from 2002 to 2014 and corresponding changes to the *per capita* GNI range reflected on each year's surrogate country list).  Once Commerce determines the range, it "searches for countries within that range [that] are suitable candidates for inclusion on the list."  *Id.* at 13.[21]

Commerce emphasizes "achieving a degree of 'balance' in the [*per capita*] GNI range represented by the list" and aims to select three countries with *per capita* GNIs above and below China's *per capita* GNI, for a total of six countries.  *Id.*  The list is non-exhaustive,[22] and is intended to provide interested parties with a "manageable set of potential surrogate countries" on which to focus.  *Id.* at 15.

---

[21] Commerce considers several factors, including "[surrogate value] requirements . . ., the data quality and availability of alternative surrogate countries, economic diversity of the manufacturing sector in the alternative countries [under consideration], and the degree of specificity in the import data relied on to value the [factors of production]." Remand Results at 14.  Commerce rejected certain countries on the basis of 2014 data because they consisted of "smaller and less diversified economies" that were unlikely to represent "viable surrogate countries."  *Id.*

[22] When an interested party proposes an alternative country with a *per capita* GNI within the range of the countries on the list, Commerce affords that country the same consideration as others on the list.  Remand Results at 15.  When an interested party proposes a country with a *per capita* GNI outside the selected range, Commerce will consider the country only if its data quality and availability, and significant producer status, outweigh its deficient economic comparability, *id.* at 14-15, and only when none

In the instant review, China's *per capita* GNI of $7,380 was roughly centered

between the highest *per capita* GNI on the surrogate country list ($9,980) and the

lowest *per capita* GNI on the list ($5,410).  *Id.* at 11, Table 1.  In contrast, in 2014, the

Philippines' *per capita* GNI was $3,440, $3,940 less than China's *per capita* GNI, and

$1,470 less than the lowest *per capita* GNI on the surrogate country list.  *See* Remand

Results at 16 & n.44 (citation omitted); Jacobi's Comments on Economic Comparability

(July 20, 2015), Attachs. A, C, PJA Tab 18, RJA Tab REM-1, ECF Nos. 92-3, 95

(containing 2014 *per capita* GNI data).  Although China's *per capita* GNI grew almost

eight times from 2002 to 2014, the Philippines' *per capita* GNI grew about 3.4 times in

the same period.  *See* Remand Results at 16, Table 2.  As Commerce explained, "[t]he

effect of this growing disparity . . . is that more [market economy] countries' *per capita*

GNI fell between the PRC and the Philippines."  *Id.* at 16.

Based on the foregoing, Commerce has provided a reasoned explanation for its

generation of the surrogate country list and its exclusion of the Philippines, which is

supported by substantial evidence demonstrating China's rising *per capita* GNI and the

widening disparity between China's and the Philippines' respective *per capita* GNIs.

CAC's contrary arguments are unavailing.

CAC asserts that Commerce "has not explained a reasonable or predictable

measure of economic comparability" because the agency's "surrogate country list

changes from year to year" in a manner that is inconsistent, unpredictable, and lacking

---

of the countries at the same level of economic development are viable surrogate
country options, *id.* at 7.

explanation.  CAC Remand Cmts at 4.  CAC further asserts that Commerce has not, as it averred, expanded the *per capita* GNI range of the countries on the list at roughly the same rate as China's expanding economy.  *Id.* at 5.  The court rejected similar arguments when it sustained Commerce's redetermination on the matter of economic comparability issued pursuant to *Jacobi (AR7) I*.  *See Jacobi Carbons AB v. United States ("Jacobi (AR7) II")*, 42 CIT____, Slip Op. 18-46 at 18-19 (Apr. 19, 2018).  Therein, the court explained that "Commerce's expansion of its GNI range need not exactly mirror China's economic growth; mathematical precision is not required."  *Id.* at 15-16 (quoting *Dorbest*, 755 F. Supp. 2d at 1298 ("Commerce does not have to achieve mathematical perfection in its choice of countries to act as bookends for its initial selection [of the GNI range].")).  Further, "it would be inappropriate for this court to impose [a] bright-line requirement" that Commerce's expansion of the *per capita* GNI range match China's changing *per capita* GNI because "[t]he GNI data on which the surrogate country list is based is a fluid measurement that can change from year to year."  *Id.* at 19 (citation omitted).  So too here, Commerce's re-centering of the *per capita* GNI range is responsive to annual changes in both China's *per capita* GNI and the GNI of economically proximate countries.  *See* Gov. Remand Reply at 10-11.

CAC also asserts that Commerce stated it considers data availability and quality before selecting countries to include on the list, but failed to provide this data to interested parties.  CAC Remand Cmts at 5 (citing Surrogate Country Ltr, Attach. 1).  Commerce stated, however, that the listed countries "are *likely* to have good data availability and quality."  Surrogate Country Ltr, Attach. 1 at 2 (emphasis added).

Although "there were several [market economy] countries in close proximity to the PRC," such as the Maldives and Botswana, those "smaller and less diversified economies" are not viable surrogates in light of "the data quality and availability of alternative surrogate countries, and [the] economic diversity of the manufacturing sector in the alternative countries."  Remand Results at 14.  Thus, Commerce did not purport to assess specific data sources before compiling the list; rather, the agency considers the size and diversity of the economy and its implications for data availability and quality when selecting countries for inclusion.  Commerce's redetermination as to economic comparability is supported by substantial evidence.

### B.  Significant Producer of Comparable Merchandise

Neither the statute nor Commerce's regulations define "significant producer." *See* 19 U.S.C. § 1677b; 19 C.F.R. § 351.408; Policy Bulletin 04.1.  Because the term is undefined and ambiguous, the court must assess whether Commerce's interpretation of significant producer "'is based on a permissible construction of the statute.'"  *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1344 (Fed. Cir. 2017) (quoting *Chevron, U.S.A., Inc. v. Nat'l Res. Defense Council, Inc.*, 467 U.S. 837, 843 (1984)).

For the *Final Results*, Commerce relied on "export quantities" to find that Thailand is a significant producer of comparable merchandise.  I&D Mem. at 16.  On remand, Commerce instead determined that Thailand is a significant producer based on evidence of domestic production of identical merchandise as contained in Carbokarn's

2011 financial statement.  Remand Results at 20, 38, 39.[23]  CAC asserts that evidence

of "some production" fails to support a finding of "significant production," and Commerce

failed to adhere to Policy Bulletin 04.1's tier-based method of measuring significant

production.  *Id.* at 7-8.  CAC further characterizes Carbokarn's 2011 financial statement

as "extremely weak support" for the agency's finding that Thailand is a significant

producer because it "gives no measure of the amount of its production of comparable or

identical merchandise," and is outdated.  *Id.* at 6-7 (noting the absence of record

evidence regarding whether "Carbokarn still produces comparable merchandise or even

continues to operate at all").  For the following reasons, Commerce's redetermination is

unsupported by substantial evidence.[24]

On remand, Commerce explained that "if comparable merchandise is produced,

a country qualifies as a producer of comparable merchandise."  Remand Results at 19

& n.56 (citing *Sebacic Acid from the People's Republic of China*, 62 Fed. Reg. 65,674,

---

[23] Commerce also discussed Thailand's export quantities in the redetermination, but
was unclear whether it continued to rely on that measure.  *See* Remand Results at 21
("While we are not relying on export quantity . . . , the record demonstrates that Thailand
is a significant exporter . . ., a metric that the Department may rely on . . . .").  At oral
argument, the Government confirmed that Commerce did *not* rely on export quantities in
its redetermination.  Oral Arg. at 10:30-10:56 (reflecting the time stamp from the
recording).  Accordingly, the court will not address Commerce's discussion of exports or
CAC's challenge thereto.  *See* Remand Results at 21; CAC Remand Cmts at 8-9.
[24] At oral argument, the Government sought to downplay the degree to which Thailand's
status as a significant producer is in controversy, contending that CAC's argument that
Thailand is not the *most* significant producer should be understood as a concession that
Thailand is, in fact, a significant producer.  Oral Arg. at 4:25-5:03, 18:25-18:54, 19:13-
19:41.  CAC opposed the remand, *see, e.g.,* CAC Remand Cmts at 1-4, and raised
several substantive arguments regarding the merits of Commerce's redetermination as
to Thailand's status as a significant producer, *see id.* at 6-9.  Accordingly, the issue is
properly before the court.

65,676 (Dep't Commerce Dec. 15, 1997) (final results of antidumping admin. review;

1995-1996) ("*Sebacic Acid*")).  Commerce further explained that record evidence of

domestic production, including financial statements, "directly addresses the requirement

of significant production of comparable merchandise."  *Id.* at 19-20 & n.57 (citing

*Dorbest Ltd. v. United States*, 30 CIT 1671, 1683-84, 462 F. Supp. 2d 1262, 1274

(2006) (upholding Commerce's selection of India as a significant producer on the basis

of several financial statements of Indian companies), *rev'd on other grounds*, 604 F.3d

1363 (Fed. Cir. 2010)).  "Accordingly," Commerce concluded, Carbokarn's 2011

financial statement "demonstrates that there is significant production of comparable

merchandise in Thailand," and, "in and of itself, establishes that Thailand is a significant

producer."  *Id.* at 20; *see also id.* at 21 & n.67 (citation omitted).

        The court rejected identical reasoning in *Jacobi (AR7) II*, and does so here.

Therein, the court explained that "*Sebacic Acid* is an example of Commerce exercising

broad discretion to determine what constitutes comparable merchandise for purposes of

selecting its primary surrogate country."  *Jacobi (AR7) II*, Slip Op. 18-46 at 26 (citation

omitted).  Moreover, although "evidence of domestic production of comparable

merchandise may directly *address*[] the requirement of significant production, . . .

nothing in Commerce's *Sebacic Acid* ruling suggests that it *fulfills* the requirement

without more."  *Id.* (internal quotation marks and citation omitted) (alteration original).

The court further distinguished *Dorbest* on the basis of evidence in that case that

Commerce had relied on "nine Indian surrogate financial statements *in addition to*

directories of hundreds of Indian furniture producers and information on the value of

Indian furniture output." *Id.* (citing *Dorbest*, 30 CIT at 1683, 462 F. Supp. 2d at 1274).

Accordingly, *Dorbest* does not support Commerce's conclusory reliance on a single

financial statement.

At oral argument, the court pressed the Government to explain the meaning that

Commerce gives the term "significant producer" and identify the agency's application of

that standard.  The Government pointed to Commerce's discretion to define significant

production by way of reference to domestic production, and relied on the agency's

expertise to support its determination that Carbokarn's production was significant.  Oral

Arg. at 3:08-4:25.  The court is not persuaded.

Although Commerce's "experience and expertise . . . presumably enable the

agency to provide the required explanation, [it does] not substitute for the explanation."

*CS Wind Vietnam Co., Ltd. v. United States*, 832 F.3d 1367, 1377 (Fed. Cir. 2016).

Commerce's Policy Bulletin 04.1 recognizes the comparative aspect of the phrase

"significant production."  Policy Bulletin 04.1 at 3 (Commerce's significant producer

determination "should be made consistent with the characteristics of world production

of, and trade in, comparable merchandise");[25] *see also Fresh Garlic Prod. Ass'n v.*

---

[25] By way of example,

    if there are just three producers of comparable merchandise in the world, then arguably any commercially meaningful production is significant. Intermittent production, however, would not be significant.  If there are ten large producers and a variety of small producers, "significant producer" could be interpreted to mean one of the top ten.  If, in the example above, there is also a middle-size group of producers, then "significant producer" could be interpreted as one of the top ten or middle group.

Policy Bulletin 04.1.

*United States*, 39 CIT____,____, 121 F. Supp. 3d 1313, 1338–39 (2015).[26]  Policy

Bulletin 04.1 implements the well settled rule "that a statute must, if possible, be

construed in such a fashion that every word has some operative effect."  *See United*

*States v. Nordic Village Inc.*, 503 U.S. 30, 36 (1992).  Here, however, Commerce's

analysis fails to give meaning to the term "significant" or otherwise explain its conclusion

that Carbokarn's production is "significant."[27]  Without that explanation, the court lacks

---

[26] In *Fresh Garlic*, the court opined that

> an interpretation of "significant producer" countries as those whose
> domestic production could influence or affect world trade would be a
> permissible construction of the statute. This follows from the plain
> meaning of the word "significant" as something "having or likely to have
> influence or effect." This definition, however, necessarily requires
> comparing potential surrogate countries' production to world production of
> the subject merchandise.

121 F. Supp. 3d at 1338–39 (citations omitted); *see also Jacobi (AR7) I*, 222 F. Supp.
3d at 1180 (noting that Policy Bulletin 04.1 is consistent with *Fresh Garlic*).

[27] Commerce's reference to Carbokarn's revenue does not render its determination
sufficiently "discernible."  *See NMB Singapore Ltd. v. United States,* 557 F.3d 1316,
1319 (Fed. Cir. 2009).  Commerce appears to assume that all of Carbokarn's 2011
revenue is derived from sales of activated carbon.  *See* Remand Results at 21 n.67 ("In
2011, [Carbokarn] had activated carbon sales of 358,392,992.16 Baht.") (citing DJAC
Second Surrogate Value Submission (Jan. 4, 2016) ("DJAC Jan. 4, 2016 Surrogate
Value Submission"), Ex. 8B ("2011 Carbokarn Financial Statement"), PJA Tab 7, PR
317, 319, ECF No. 92-2).  That figure represents Carbokarn's total sales revenue, which
is derived from "[m]anufacture, export and import [of] charcoal water filter, Charcoal, and
chemical products."  2011 Carbokarn Financial Statement (Carbokarn's sales
revenue represents 96.57 percent of its total revenue).  Accordingly, the production
Commerce relied upon to support its determination derives from revenue from an
unidentified mix of sales of comparable and non-comparable merchandise and
import/export activities.  *See id.*  At oral argument, in responding to the court's question
regarding the basis for Commerce's assumption, the Government sought to cast the
burden on CAC to supply evidence disproving the significance of Carbokarn's
production.  Oral Arg. at 30:59-31:20.  Although an interested party has "the
responsibility to make the case for the set of data that it favors," *Taian Ziyang Food Co.,*
*Ltd. v. United States*, 35 CIT____, 783 F. Supp. 2d 1292, 1331 (2011), CAC is not
advocating for Commerce's use of Thai data.  Additionally, while the general rule

the means to ensure that Commerce's redetermination is not arbitrary.  *See Apex Frozen Foods*, 862 F.3d at 1346.  Accordingly, Commerce's redetermination is unsupported by substantial evidence and must be remanded.

## III.  Surrogate Values

Plaintiffs challenge Commerce's selection of Thai surrogate values for carbonized material, hydrochloric acid, coal tar, and financial ratios.  Each will be discussed, in turn.

### A.  Carbonized Material

For the *Final Results*, Commerce selected Thai HS code 4402.90.10000, exclusive of French imports, to value Jacobi's carbonized material.  I&D Mem. at 30-33. Commerce concluded that without the French imports there "remain[ed] a significant volume of imports . . . to calculate a [surrogate value]."  *Id.* at 32-33.

#### 1.  Parties' Contentions

Jacobi contends that Commerce's selection of Thai import data contradicts its reliance on Philippine *Cocommunity* data in prior reviews; Commerce should have considered Philippine data for surrogate value or benchmarking purposes; and the

---

allocates "the burden of creating an adequate record" to interested parties, *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011), it does not relieve Commerce of its burden of ensuring that its determinations are supported by substantial evidence, *see* 19 U.S.C. § 1516a(b)(1)(B)(i).  *Cf. Taian Ziyang Food Co., Ltd.*, 783 F. Supp. 2d at 1331 (Commerce must "obtain adequate evidence" for its surrogate values, which may not be selected "by default").  The lack of clarity regarding Carbokarn's production, to which CAC pointed, *see* CAC Remand Cmts at 6-7, supports the need for a second remand for Commerce to explain further or reconsider its significant producer determination.

imports that remained after Commerce removed those from France represented a

commercially insignificant quantity that Commerce unreasonably assumed constituted

the type of carbonized material Jacobi consumed.  Jacobi Rule 56.2 Mem. at 15-20; *see*

*also* Rule 56.2 Reply Br. of Pls. Jacobi Carbons AB Jacobi and Jacobi Carbons, Inc.,

("Jacobi Rule 56.2 Reply") at 3-8, ECF No. 84; M. L. Ball Rule 56.2 Mem. at 7,10-11

(advancing similar arguments).  CAC likewise contends that Commerce erred in relying

on Thai import data derived from a commercially insignificant quantity.  CAC Rule 56.2

Mem. at 26-32; *id.* at 27 (asserting that the respondents' consumption of carbonized

material "dwarf[s]" the roughly 122 metric tons underlying the Thai import data);[28] *see*

*also* Consol. Pls. Carbon Activated Corp., Ningxia Mineral and Chemical Limited, Shanxi

DMD Corporation, Shanxi industry Technology Trading co., Ltd., Shanxi Sincere

---

[28] According to CAC, "Jacobi consumed over 7,000 metric tons of carbonized material"
and "DJAC purchased, sold, and produced many times more carbonized material than
imported into Thailand" during the relevant period of review.  CAC Rule 56.2 Mem. at 27
(citing Jacobi § D Resp. (Aug. 14, 2015) ("Jacobi § D QR"), Ex. NXGH D-12 (factors of
production summary for Jacobi's unaffiliated supplier Huahui), PJA Tab 21, PR 122,
Suppl. CJA Tab 1, CR 72, 73-75, ECF No. 103-1; Jacobi § D Resp. Part II (Aug. 19,
2015) ("Jacobi § D QR, Part II"), PJA Tab 4, PR 135, Suppl. CJA Tab 2, CR 153-160,
162, 174-176, 178, 188, ECF Nos. 103-2-103-5; DJAC 1st Suppl. Resp. (Oct. 21, 2016)
("DJAC Suppl. QR") at 16, PJA Tab 25, PR 248, Suppl. CJA Tab 3, CR 228-229, ECF
No. 103-6).  The cited exhibits demonstrate that Huahui consumed [[     ]] metric tons
of carbonized material during the period of review, Jacobi § D QR, Ex. NXGH D- 12,
and, in one POR-month, DJAC used [[     ]] metric tons of carbonized material,  DJAC
Suppl. QR at 16.  Part II to Jacobi's § D QR contains FOP data for Jacobi's unaffiliated
activated carbon supplier Ningxia Huahui Activated Carbon Co., Ltd.  ("NXHH").  Jacobi
§ D QR, Part II at 2.  The relevant narrative and exhibits are unclear,  however,
regarding the extent to which NXHH's carbonized material consumption is imputable to
Jacobi for the purpose of fully substantiating CAC's assertion.  *See id.*, Ex.  C
(containing NXHH's § D questionnaire response and exhibits).

Industrial Co., Ltd., Tianjin Channel Filters Co., Ltd., and Tianjin Maijin Industries Co.,

Ltd. Reply Br. ("CAC Rule 56.2 Reply") at 13-14, ECF No. 86.

The Government contends that Jacobi's argument regarding the specificity of

Thai import data is speculative; Commerce appropriately found that Thai import

quantities were not commercially insignificant as compared to the respondents'

production experiences; and Commerce properly declined to consider data from non-

economically comparable countries.  Gov. 56.2 Resp. at 39-45.

> **2. Commerce's Determination Lacks Substantial Evidence Regarding the Commercial Significance of the Import Quantity Underlying Commerce's Surrogate Value**

As an initial matter, "each administrative review is a separate exercise of

Commerce's authority that allows for different conclusions based on different facts in the

record."  *Jiaxing Brother Fastener Co., Ltd.*, 822 F.3d at 1299 (quoting *Qingdao*, 766

F.3d at 1387).  Commerce's past reliance on Philippine *Cocommunity* data to value

carbonized material, without more, does not undermine Commerce's selection of Thai

data in this segment of the proceeding.  Unlike in prior reviews, here, Commerce

concluded that the Philippines is not at the same level of economic development as the

PRC.  *See, e.g.*, Remand Results at 15-18.  Accordingly, this is not a situation where

Commerce has failed to articulate sufficient reasons for treating similar situations in a

dissimilar manner.  *See, e.g.*, *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382

(Fed. Cir. 2001) ("[A]n agency action is arbitrary when the agency offer[s] insufficient

reasons for treating similar situations differently.") (first alteration added) (citation omitted).[29]

Further, Jacobi has failed to substantiate its arguments that the Thai import data is aberrant and non-specific.  In the underlying administrative proceeding, Jacobi argued that the Thai value—inclusive of French imports consisting of wood-based charcoal— was aberrantly high.  *See* Jacobi Case Br. (May 13, 2016) at 35-37, PJA 13,  PR 416, ECF No. 92-3.  After removing French imports, the Thai import value  decreased from 37.31 Baht/kg to 17.3483 Baht/kg.  *Compare id.* at 32, *with* Jacobi Final  Results Mem. at Attach. 1.  In the instant matter, Jacobi does not contend that the  subsequent value is aberrant; it merely contends that Commerce impermissibly ignored  Philippine data for benchmarking purposes.  Jacobi Rule 56.2 Mem. at 20;[30] Jacobi  Rule 56.2 Reply at 5; *see also* M. L. Ball Rule 56.2 Mem. at 11.  Jacobi also fails to  identify evidence showing that the imports from countries other than France constitute  wood-based charcoal rather than coconut shell charcoal.  Jacobi Rule 56.2 Mem. at 18  (contending "it was unreasonable for Commerce to <u>assume </u>[the nature of the imports]").

---

[29] On remand, however, Commerce may reconsider its position with respect to Philippine *Cocommunity* data in the event it concludes that the Thai import data derives from a commercially insignificant quantity.  *See, e.g.*, I&D Mem. at 31 (declining to consider Philippine data because it is from a non-listed country *and* because Commerce determined that it had data from a listed country).

[30] Jacobi appears to contend that Commerce must always benchmark its chosen surrogate value.  *See* Jacobi Rule 56.2 Mem. at 12 (summarizing its views on how Commerce must select its surrogate values).  However, the cases it cites do not support this interpretation of Commerce's surrogate value selection methodology.  Instead, Commerce examines benchmarking data "[w]hen presented with sufficient evidence to demonstrate a particular [surrogate value] is aberrational."  I&D Mem. at 31.

Because it is not the court's role to "develop its own theory of why the selected [value] may be [aberrantly high or non-specific], effectively litigating the issue for [Plaintiffs]," *Essar Steel Ltd. v. United States*, 36 CIT____, 880 F. Supp. 2d 1327, 1332 (2012) (quoting *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990) ("[I]ssues adverted to in a perfunctory manner . . . are deemed waived.")), these arguments lack merit and will not be afforded further consideration.

Plaintiffs persuade the court, however, that a remand is required with respect to Commerce's conclusory analysis regarding commercial significance.  Although "Commerce need not duplicate the exact production experience of the Chinese manufacturers at the expense of choosing a surrogate value that most accurately represents the fair market value of [the respective input] in a hypothetical market-economy []," *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (internal quotation marks, alterations, and citation omitted), "a surrogate value must be as representative of the situation in the NME country as is feasible," *id.* Representativeness is important if Commerce is to fulfill its statutory mandate of calculating dumping margins as accurately as possible.  *Juancheng Kangtai Chem. Co., Ltd. v. United States*, Slip Op. 15-93, 2015 WL 4999476, at *25 (CIT Aug. 21, 2015) (citation omitted); *see also* S*hakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) (noting Commerce's obligation to "establish[] antidumping margins as accurately as possible.").  For this reason, the court has remanded agency determinations that failed to adequately address the commercial significance of the quantities underlying its selected surrogate

values.  *See Juancheng Kangtai*, 2015 WL 4999476, at *25; *Xinjiamei Furniture (Zhangzhou) Co., Ltd. v. United States*, Slip Op. 13-30, 2013 WL 920276, at *5 (CIT Mar. 11, 2013); *Shanghai Foreign Trade Enters. Co., Ltd. v. United States*, 28 CIT 480, 318 F. Supp. 2d 1339, 1352-53 (2004).[31]

The Government asserts generally that "Commerce was within its discretion to conclude, as it did, that Thai import quantities were not too small to be representative of respondents' production price."  Gov. Rule 56.2 Resp. at 40-41.  Commerce indeed has "wide discretion in the valuation of factors of production," *Nation Ford*, 166 F.3d at 1377, but that discretion does not absolve the agency of its responsibility to articulate a "rational connection between the facts found and the choice made," *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962).  Commerce's conclusory assertion regarding the significance of the imports into Thailand fails to apprise the court why 122 metric tons is sufficiently significant to yield a representative price in light of respondents' production experience.  *See supra* note 28.

---

[31]Jacobi relies on the U.S. Court of International Trade's ("CIT") opinion addressing challenges to the sixth administrative review of the AD Order on certain activated carbon.  Jacobi Rule 56.2 Mem. at 18-19 (citing *Calgon Carbon Corp. v. United States*, 41 CIT____, 145 F. Supp. 3d 1312, 1327-29 (2016)); *see also* M.L. Ball Rule 56.2 Mem. at 10 (citing same).  Therein, the court noted that the 160 metric tons of imports underlying the non-contemporaneous surrogate value for anthracite coal upon which Commerce relied may not be as reliable as more contemporaneous values that were based on higher quantities; however, it remanded Commerce's surrogate value selection because the agency had failed to articulate reasons beyond its preference for using values from the primary surrogate country to support its selection.  *Calgon Carbon*, 145 F. Supp. 3d at 1327-28.

The Government also asserts that Commerce need not rely on the dataset that is

derived from the highest import volume.  Gov. Rule 56.2 Resp. at 42 (citing, *inter alia*,

*Trust Chem Co. Ltd. v. United States*, 35 CIT____, 791 F. Supp. 2d 1257, 1264-65

(2011)).  While *Trust Chem* is distinguishable,[32]  in this case, there is some indication

that a Thai producer of activated carbon would source carbonized material domestically

rather than from imports.  *See* Jacobi Pre-Prelim. Surrogate Value Comments (Jan. 4,

2016) ("Jacobi Jan. 4, 2016 Surrogate Value Cmts"), Ex. SV2-17, PJA Tab 6, PR 281-

282, 297-299, 325, ECF No. 6 (noting that Thailand's coconut shell charcoal industry is

based on its substantial coconut production (1,380,980 metric tons in 2009), which

supports a POR Thai domestic price for coconut shell charcoal in the range of 10.0-10.5

Baht/kg).  *Cf. Juancheng Kangtai*, 2015 WL 4999476, at *21 (2015) (noting the

Government's argument that "the price the producer in the surrogate country pays for

the input in the production of subject merchandise is determinative" in its calculation of

normal value) (citation omitted); *Longkou Haimeng Mach. Co., Ltd. v. United States*, 33

CIT 603, 613, 617 F. Supp. 2d 1363, 1373 (2009) (affirming Commerce's reliance on

Indian import data because it "represent[s] the types and prices of pig iron available to

Indian producers of gray iron brake rotors").[33]  Accordingly, this issue is remanded for

---

[32] Therein, the plaintiff argued that the import volume underlying Commerce's surrogate
value selection was "infinitesimally small," aberrant, and unrepresentative.  *Trust Chem*,
791 F. Supp. 2d at 1264.  The court noted that the "question is whether the *relative*
quantity of imports is distortive," and the record lacked evidence regarding any disparity
between the import volume and India's domestic consumption.  *Id.* at 1265.
[33] The Government's reliance on two additional CIT cases is misplaced.  *See* Gov.
Resp. at 42 (quoting *Laizou Auto Brake Equip. Co. v. United States*, 32 CIT 711, 717
(2008) ("[A] larger data set, in and of itself, is not necessarily better in valuing factors of

Commerce to reconsider its selection of Thai import data to value carbonized material

or further explain the commercial significance thereof.

### B. Hydrochloric Acid

Commerce selected Thai HS code 2806.10.00102 in the amount of 77.4643

Baht/kg to value Jacobi's hydrochloric acid consumption.  Jacobi Final Results Mem.,

Attach. 1.  Commerce explained that, because Thailand is the primary surrogate

country, its "regulatory preference for valuing all surrogate values from one surrogate"

meant that its "first preference in selecting surrogate value data . . . is to utilize publicly

available prices within Thailand."  I&D Mem. at 34.  Commerce, therefore, declined

DJAC's invitation to select Bulgarian or Romanian import data.  *See id.* at 33-34.

In response to arguments regarding possible aberrancy in the Thai import data,

Commerce explained:

--------------------------------------------

production than a smaller one); *Sichuan Changhong Elec. Co. v. United States*, 30 CIT 1481, 1501, 460 F. Supp. 2d 1338, 1356 (2006) ("Commerce [does] not ha[ve] a longstanding practice of omitting import values merely because they were the product of a small quantity of imported goods").  In *Laizou*, the court affirmed Commerce's reliance on Indian import data rather than domestic data when it was more specific to the relevant input, pig iron, "broadly collected from imports into all of India as opposed to from a few companies," and the underlying volume "significantly exceed[ed] the volume of pig iron consumed by several of the respondents."  32 CIT at 717-18.  In contrast, here, the volume of carbonized material consumed by the respondents far exceeds the amount imported into Thailand.  *See supra* note 28.  In *Sichuan*, the plaintiff challenged Commerce's failure to exclude from Indian import data imports from countries in small quantities because the prices were aberrantly high.  30 CIT at 1500, 460 F. Supp. 2d at 1355.  Commerce explained that the agency does not have a practice of excluding small quantity imports, but rather "only data that is deemed distortive."  30 CIT at 1500, 460 F. Supp. 2d at 1356.  Plaintiffs here do not contend that Commerce failed to exclude *particular* imports into Thailand because they were small quantity, but that Commerce erred in relying on a value based on an *overall* commercially insignificant quantity.

> [w]hen considering benchmark data, the [agency] examines historical
> import data for the potential surrogate countries for a given case, to the
> extent such import data is available, and/or examines data from the same
> HS category for the primary surrogate country over multiple years to
> determine if the current data appear aberrational compared to historical
> values.  Merely appearing on the low or high end of a range of values is
> not enough to make data aberrational.

*Id.* at 34-35 (footnotes omitted).  Interested parties had proposed several sources of

benchmarking data.  However, Commerce rejected (1) data from the United States,

Germany, Belgium, and France because those countries are not at the same level of

economic development as the PRC; (2) Thai and Mexican export data on the basis of its

practice not to use export values as benchmarks; and (3) HCL surrogate values from

prior administrative reviews of this order.  *Id.* at 34-35.  Commerce explained that it was

unable to test the Thai import data for aberrancy because the record lacked historical

data for the relevant HS code from countries at the same level of economic development

as the PRC or for the Thai HS code it relied upon.  *Id.* at 35.

### 1.  Parties' Contentions

Jacobi contends that Commerce's HCL surrogate value is aberrational and

Commerce erroneously ignored benchmarking data on the record.  Jacobi Rule 56.2

Mem. at 28-29; *see also* M. L. Ball Rule 56.2 Mem. at 13-14 (advancing the same

argument).  The Government responds that Jacobi "proffer[ed] inappropriate

benchmarks."  Gov. Rule 56.2 Resp. at 49.  The Government further contends that data

from countries on Commerce's surrogate country list did not demonstrate that the Thai

data was aberrant.  *Id.* at 50.

### 2. Commerce's Selection of Thai Import Data to Value Jacobi's Hydrochloric Acid Input Lacks Substantial Evidence

As noted above, Commerce has wide discretion in fulfilling its statutory mandate to select the best available information for purposes of surrogate value selection. *Qingdao,* 766 F.3d at 1386; 19 U.S.C. § 1677b(c)(1)(B).  Nevertheless, Commerce's determinations must be accompanied by reasoned explanation and supported by substantial evidence.  *Xiamen Int'l Trade & Indus. Co. v. United States*, 37 CIT____, 953 F. Supp. 2d 1307, 1312-13 (2013).  Commerce's preference for using data from the primary surrogate country, relied upon here, serves that statutory mandate when it "support[s] a choice of data as the best available information" when "the other available data[,] *upon a fair comparison*, are otherwise seen to be fairly equal."  *Calgon Carbon*, 145 F. Supp. 3d at 1326-27 (internal quotation marks and citation omitted) (emphasis added).  Commerce's preference, therefore, does not substitute for an examination of the record data from which it is to choose the "best available."  *See id.*

In addition to Thai import data, the record contained Bulgarian import data based upon 22,037 metric tons of HCL imports reflecting an average price of $77.95/metric ton ("MT"), and Romanian import data based upon 8,935 metric tons HCL imports and reflecting an average price of $57.90/MT.  DJAC Case Br. (Apr. 29, 2016) at 42, PJA Tab 12, PR 400, ECF No. 92-3.  In contrast, Thai import data derived from just 61.5 metric tons of HCL imports and yielded an average price of $2,347/MT.  *Id.*  Commerce did not address adequately these data points, either as potential surrogate values or as

benchmarks for the Thai value.  *See* I&D Mem. at 34.[34]    Commerce's failure to address

the stark differences in import quantities and average prices renders the court unable to

conclude that its surrogate value selection is supported by substantial evidence and

reasoned explanation.  *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379

(Fed. Cir. 2003) (the court's review must take into account "the record as a whole,

including evidence that . . . 'fairly detracts from the substantiality of the evidence.'")

(quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

Commerce's reasons for dismissing proffered benchmark data also lack merit.

Commerce limited its benchmarking inquiry to (1) historical data from (2) countries that

presently occupy the same level of economic development as the PRC.  *See* I&D Mem.

at 35.  In so doing, Commerce failed to address several sources of evidence suggesting

aberrancy within the Thai import data.  Those sources included (1) current import data

from other countries on Commerce's surrogate country list;[35] (2) current import and

---

[34] Bulgaria and Romania each met Commerce's economic comparability criterion.  *See* Surrogate Country Ltr. Attach. 1.  At oral argument, the Government explained that Commerce's rationale for rejecting Bulgarian import data to value anthracite coal—that Bulgaria is not a significant producer of comparable merchandise—applies equally to its selection of a surrogate value for hydrochloric acid.  Oral Arg. at 59:53-1:00:53; *see also* I&D Mem. at 24.  Assuming *arguendo* that the Government's assertion does not constitute impermissible *post hoc* reasoning, there remains the Romanian import data that Commerce ignored.  To that end, the Government argued that Commerce will rely on its preference for data from the primary surrogate country.  Oral Arg. at 1:01:06-1:01:25.  As discussed herein, however, the potential for aberrancy within the Thai data suggests a reason to look elsewhere.

[35] The record shows that the Thai value is 30 times higher than the POR-current Bulgarian value and 40 times higher than the POR-current Romanian value.  *See* DJAC Case Br. at 42.

domestic data from countries not on Commerce's surrogate country list;[36] (3) surrogate

value data from prior reviews;[37] and (4) export data.[38]

Commerce's refrain that "merely appearing" at the "high end of a range of values

is not enough to make data aberrational" and concomitant refusal to address concerns

arising from the stark differences in prices reflected in the first category of information,

I&D Mem. at 35, "is of dubious merit when applied in this circumstance, which is the

enormous disparity between the value shown in the [Thai] data and the [Bulgarian and

Romanian] data," *Peer Bearing Co.-Changshan v. United States*, 35 CIT＿＿, 752 F.

Supp. 2d 1353, 1371 (2011) (remanding for Commerce to address price disparities

when its surrogate value was about three times higher than other values on the record

---

[36] Including, for example, import data from the United States reflecting an average price of $129.22/metric ton based on 417,608 metric tons of imports. *See* DJAC Case Br. at 42-43.

[37] Jacobi proffered Philippine data from the fourth through sixth periods of review for comparison purposes. *See* Jacobi Case Br. at 45 & n.103 (citations omitted); Jacobi's Surrogate Value Comments (Sept. 24, 2015) ("Jacobi Sept. 24, 2015 Surrogate Value Cmts"), Ex. SV-4, PJA Tab 5, PR 164, 188, 190-195, ECF No. 92-1 (surrogate value summaries for PORs one to six). The average HCL surrogate value Commerce relied upon for the fourth through sixth periods of review was $490.26/metric ton. *See* Jacobi Case Br. at 45.

[38] Commerce rejected DJAC's Thai and Mexican POR export data for benchmarking purposes. I&D Mem. at 35 & n.183 (citation omitted). Although Jacobi notes Commerce's dismissal of this evidence, *see* Jacobi Rule 56.2 Mem. at 29 (summarizing proffered benchmark values), Jacobi does not argue that Commerce should have considered export values for purposes of benchmarking its HCL surrogate value selection, *see* Jacobi Rule 56.2 Mem. at 28-30. *Cf. id.* at 26-28 (presenting substantive arguments regarding Commerce's dismissal of export data for purposes of testing the aberrancy of Commerce's surrogate value for coal tar). Accordingly, any argument that Commerce should have relied on export values for purposes of benchmarking Commerce's HCL surrogate value is waived. *See Essar Steel*, 880 F. Supp. 2d at 1332; *Zannino,* 895 F.2d 1, 17.

from economically comparable countries).  As to the second and third categories of

information, the court has regularly rejected Commerce's conclusory dismissal of

benchmarking data for lack of economic comparability.  *See Jacobi (AR7) II*, Slip Op.

18-46, at 46-47 (collecting cases); *id.* at 48 (noting that "economic comparability and,

thus, the usefulness of proffered benchmarks, is a matter of degree") (citing *Calgon*

*Carbon*, 190 F. Supp. 3d at 1234; *Blue Field (Sichuan),* 949 F. Supp. 2d at 1317).[39]

Accordingly, this issue is remanded for Commerce to reconsider or further explain its

selection of Thai import data in light of the alternatives, and to reconsider or further

explain it position with respect to the proposed benchmarks and, if appropriate,

reconsider its surrogate value selection in light of the proposed benchmark data.

### C.  Coal Tar

Commerce selected Thai HS code 2706 ("Mineral Tars, Including Reconstituted

Tars") to value Jacobi's coal tar.  I&D Mem. at 39.  Commerce rejected Jacobi's

arguments that Thai import data was aberrant.  Reiterating its benchmarking practice

discussed above, Commerce stated that the record lacked historical data from Thailand

---

[39] In *Jacobi (AR7) II*, the court explained that changes to Commerce's surrogate country list stemming from changes in China's GNI mean that

> historical data from a current potential surrogate country may derive from a time when that country was *not* at the same level of economic development as the PRC.  Commerce provides no explanation why such data might be a useful benchmark, while historical data from a country that Commerce then considered to be at the same level of economic development as the PRC may not be considered for benchmarking purposes if the country is, at present, no longer at the same level of economic development.

*Jacobi (AR7) II*, Slip Op. 18-46, at 47-48.  The same rationale applies equally here.

or other countries on its surrogate country list, and declined to consider coal tar values from prior reviews or export values to examine aberrancy.  *Id.* at 39-40.  Commerce further stated that because the Thai import value of $1,877.59/MT was less than the Mexican import value of $2,270.49/MT, it "is not outside the coal tar prices of other countries identified on the surrogate country list."  *Id.* at 40.[40]  Commerce also rejected Jacobi's argument that the Thai import data was non-specific, reasoning that Commerce has relied on HS code 2706 in past reviews and alternate surrogate values were equally specific.  *Id.* at 40 & n.215 (citation omitted).

### 1.  Parties' Contentions

Jacobi contends that aberrancy within the Thai import data is demonstrated by the significant increase in price in this review as compared to surrogate values selected in the first six administrative reviews of this proceeding,[41] and Commerce incorrectly

---

[40] Within its discussion of benchmarking, Commerce also relied on *Clearon Corp. v. United States*, Slip Op. 15-91, 2015 WL 4978995, at *4 (CIT Aug. 20, 2015) for the proposition that the agency need not examine "data from non-economically comparable countries when making its surrogate value selections unless the parties provide information showing that quality data is unavailable from all of the economically comparable countries."  I&D Mem. at 39-40 & n.209 (citing *Clearon*, 2015 WL 4978995, at *4).  That particular quotation, however, is taken from the court's discussion of Commerce's review of potential surrogate values, not potential benchmarking values.  Further in, the court opined that data from countries not on Commerce's surrogate country list may provide useful benchmarks.  *Clearon*, 2015 WL 4978995, at *7.  Commerce's reliance on *Clearon* is, thus, misplaced.

[41] To support this contention, Jacobi asserts that the Federal Circuit "has explicitly recognized that past [surrogate value] decisions by Commerce are a useful tool for analyzing whether a particular [surrogate value] choice is aberrational."  Jacobi Rule 56.2 Mem. at 22 n.9 (citing *Jacobi Carbons AB v. United States*, 619 F. App'x. 992, 1005 (Fed. Cir. 2015)).  The portion of the Federal Circuit opinion that Jacobi seeks to rely upon, however, is the dissenting opinion.  *See id.* at 1005 (Bryson, J., dissenting).  While the majority opinion contains similar language, it is dicta.  The CAFC declined to

dismissed export data for benchmarking purposes.  Jacobi Rule 56.2 Mem. at 22, 25-

28.  Jacobi further contends that the aberrancy is explained by the lack of specificity of

imports into Thailand under the selected four-digit HS code.  *Id.* at 23; *id.* at 25 (noting

that all imports into Thailand pursuant to HS code 2706 were under the "other" category

and did not include coal tar) (citing Jacobi Jan. 4, 2016 Surrogate Value Cmts, Ex. SV2-

18); *see also* CAC Rule 56.2 Mem. at 33-37 (advancing similar arguments, including

that aberrancy is demonstrated by evidence that the Thai import value selected for this

review is three times the Thai import value selected in the seventh administrative

review); M. L. Ball Rule 56.2 Mem. at 11-13.[42]  Jacobi asserts that Commerce should

instead have selected the Philippine HS Code 270600 ("Tar Distilled from Coal . . .")

from the fifth period of review as the surrogate value.  Jacobi Rule 56.2 Mem. at 25.

CAC contends that Commerce's reliance on Mexican import data to dismiss

aberrancy concerns within the Thai import data is flawed because the Mexican data is

based on a small import quantity.  CAC Rule 56.2 Mem. at 38.  CAC further contends

that Commerce failed to address the South African data on the record.   *Id.* at 38; *see*

*also* CAC Rule 56.2 Reply at 15-16.[43]  CAC asserts that Commerce should rely upon

---

address the argument because plaintiffs had not presented it to the agency.  *See id.* at
1000-01.

[42] Jacobi and M.L. Ball also contend that Commerce ignored data from the Ukraine, a
country on the agency's surrogate country list, for benchmarking purposes.  Jacobi Rule
56.2 Mem. at 27; M.L. Ball Rule 56.2 Mem. at 12-13.  Commerce's final surrogate
country list omitted the Ukraine, however, in favor of Mexico.  Gov. Resp. at 4, 47-48;
*see also* Surrogate Country Ltr, Attach. 1.

[43] CAC asserts that Commerce has stated that it "will consider all relevant price
information" for benchmarking purposes, and, thus, erred when it faulted Jacobi for not
providing historical information from Thailand or other countries on its surrogate country

Philippine data generally or, alternatively, South African import data to value coal tar. CAC Rule 56.2 Mem. at 38.

The Government contends that Commerce correctly rejected export values as benchmarks because "it would require an apples-to-oranges comparison of values that only include freight (i.e. the export values) with values that include cost, insurance, and freight (i.e. the Thai import statistics)."  Gov. Rule 56.2 Resp. at 47.  The Government further contends that Jacobi's assertion regarding non-specificity of the Thai HS code is unsupported by citations to record evidence.  *Id.* at 48.[44]

### 2. Commerce's Coal Tar Surrogate Value Selection Lacks Substantial Evidence

Contrary to the Government's assertion, Jacobi proffered evidence demonstrating that all imports into Thailand under HS code 2706 entered pursuant to HS code 2706.00.000.90 ("Other"), which did not include tar distilled from coal.  Jacobi Rule 56.2 Mem. at 25 (citing Jacobi Jan. 4, 2016 Surrogate Value Cmts, Ex. SV2-18); *see also* Jacobi Jan. 4, 2016 Surrogate Value Cmts, Ex. SV2-18 at ECF pp. 116-121

---

list.  CAC Rule 56.2 Mem. at 34.  However, Commerce explained that "when presented with sufficient evidence to demonstrate a particular [surrogate value] is aberrational, and therefore unreliable, the [agency] will examine *all relevant price information* on the record, *including any appropriate benchmark data*, in order to *accurately value* the input in question."  I&D Mem. at 39 (emphasis added).  Commerce's statement regarding it consideration of "all relevant price information," thus, pertained to its surrogate value selection.  Commerce did not state that it will consider "all relevant price information" as benchmarks.  *See id.*

[44] The Government further asserts that Jacobi failed to support its contention that Commerce relied upon "the broadest possible category." Gov. Rule 56.2 Resp. at 48 (quoting Jacobi Rule 56.2 Mem. at 24).  There is no dispute, however, that Commerce utilized a four-digit HS code, rather than a six- or eight-digit subcategory.  *See* I&D Mem. at 39; Jacobi Final Results Mem., Attach. 1.

(showing $231,981[45] worth of POR imports into Thailand under the "other" category, and no imports into Thailand under HS codes covering tar distilled from coal).

Commerce dismissed this evidence by pointing to its reliance on HS code 2706 in past reviews when it "found it specific to [Jacobi's] coal tar."  I&D Mem. at 40 & n.214 (citing *Certain Activated Carbon from the People's Republic of China*, 80 Fed. Reg. 61,172  (Dep't Commerce Oct. 9, 2015) (final results of antidumping duty admin. review; 2013-2014), and accompanying Issues and Decision Mem., A-570-904 (Oct. 2, 2015) ("AR7 I&D Mem."), at Cmt 7); Jacobi Sept. 24, 2015 Surrogate Value Cmts, Ex. SV-4). For periods of review one through seven, however, Commerce relied upon six- or eight-digit HS codes.  *See* AR7 I&D Mem. at Cmt 7 (selecting a six-digit Thai HS code); Jacobi Sept. 24, 2015 Surrogate Value Cmts, Ex. SV-4 (showing that, for the first six periods of review, Commerce selected six- or eight-digit Indian or Philippine HS codes). Moreover, prior reliance on subcategories of HS code 2706 lacks persuasive force when, as the Government recognizes, "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."  *Jiaxing Brother Fastener Co., Ltd.*, 822 F.3d at 1299; *see also* Gov. Rule 56.2 Resp. at 48 (responding to Jacobi's preference for Philippine data from a prior review).  Although the Thai HS code 2706 ostensibly includes subheadings covering tar

---

[45] The court observes that the final surrogate value of $1,877.59/MT suggests an import value based on less than 124 metric tons of coal tar (i.e., $1,877.59 per metric ton multiplied by 123.55 metric tons equals $231,981).  Plaintiffs, however, do not argue that the Thai import value is aberrant on the basis that it is derived from a commercially insignificant quantity.

distilled from coal, *the record of this review* demonstrates the absence of imports

pursuant to those subheadings.[46]

Commerce, therefore, failed to substantiate the specificity of its chosen value.

*See* I&D Mem. at 39-40; Prelim. Results Surrogate Value Mem. (Feb. 29, 2016) at 4-5,

PJA Tab 9, PR 367, 369, ECF No. 92-2 (establishing the coal tar surrogate value).  *Cf.*

*Jacobi Carbons AB*, 619 F. App'x. at 997 ("To determine whether a data source is

product specific, Commerce compares the products covered by the data source with the

material input in question.").  "If a set of data is not sufficiently product specific, it is of no

relevance whether or not the data satisfy the other criteria set forth in Policy Bulletin

04.1."  *Taian Ziyang Food Co., Ltd.*, 783 F. Supp. 2d at 1330 (internal quotation marks

and citation omitted).

The apparent non-specificity of the Thai import value supports Plaintiffs'

assertions of aberrancy.  As with Jacobi's hydrochloric acid input, Commerce declined

to benchmark the Thai value on the basis that the record lacked historical data from

Thailand or other countries on the surrogate country list.  I&D Mem. at 39.  For the

reasons discussed above, Commerce's conclusory dismissal of proposed

benchmarking data lacks merit.  *See supra* Section III.B.2.  Moreover, the Thai value

Commerce relied upon in the instant review ($1,877.59/MT) is almost three times the

---

[46] Commerce also dismissed Jacobi's argument on the basis that alternative surrogate values were equally specific.  I&D Mem. at 40 & n.215 (citing Jacobi Sept. 24, 2015 Surrogate Value Cmts, Ex. SV-6).  The cited exhibit contains South African import data for the six-digit HS code 270600, s*ee* Jacobi Sept. 24, 2015 Surrogate Value Cmts, Ex. SV-6, calling into question the accuracy of Commerce's conclusion.

Thai value Commerce relied upon in the seventh administrative review ($678.08/MT).

*See* Jacobi Case Br. at 43.  Commerce did not address this sudden and significant

increase in the Thai value.  *See* I&D Mem. at 40.

Additionally, the average of the surrogate values Commerce selected for the first

seven administrative reviews is $469.02/MT, with a median surrogate value of

$477.94/MT corresponding to the fifth administrative review.  *See* Jacobi Case Br. at 43;

CAC Rule 56.2 Mem. at 35.[47]  The relative stability of the world market price for coal tar

is further corroborated by South African data on the record, which reflects an import

value of $381.91/MT derived from more than 500 metric tons of imports.  *See* Jacobi

Sept. 24, 2015 Surrogate Value Cmts, Exs. SV-5, SV-6.

Commerce also declined to compare the Thai value to export values from the

world's largest coal tar exporters.  I&D Mem. at 40.  Export data from Poland, the

Russian Federation, France, and the Ukraine reflect an average export value of

$260.57.  *See* Jacobi Jan. 4, 2016 Surrogate Value Cmts, Ex. SV2-1 at ECF p. 10

(POR export statistics for the world's largest exporters of coal tar under HS code

270600); *id.*, Ex. SV2-2 at ECF pp. 97-104 (country-specific statistics).  Commerce

---

[47] Jacobi points to an average surrogate value of $434 derived from the first six reviews.
*See* Jacobi Rule 56.2 Mem. at 22; Jacobi Case Br. at 43.  Jacobi omitted the surrogate
value for the seventh administrative review on the basis that it was also derived solely
from entries under the basket category that excluded tar distilled from coal.  *See* Jacobi
Case Br. at 43 & n.100, 44 & n.102; Jacobi Jan. 4, 2016 Surrogate Value Cmts, Ex.
SV2-18 at ECF pp.122-125 (import data corresponding to the seventh administrative
review period showing that the total imports ($5,779,617) into Thailand under HS code
2706 correspond to imports under the "other" subcategory).  The relatively minor
difference in averages is immaterial to the court's discussion herein.

dismissed export data for benchmarking purposes on the basis that it would require a

comparison of free on board export values with import values inclusive of cost,

insurance, and freight.  I&D Mem. at 40.  As Jacobi contends, however, the record

contains market prices for ocean freight and insurance, thereby enabling Commerce to

make a more "apples to apples" comparison.  *See* Jacobi Rule 56.2 Mem. at 26-27;

Jacobi Rule 56.2 Reply at 9; Jacobi Final Results Mem., Attach. 1; Jacobi Prelim.

Analysis Mem., Attach. 1.  Regardless of the exclusion of these expenses, the proffered

export values corroborate the relative stability of global coal tar prices as compared to

the spike in the Thai value, undermining Commerce's refusal to undertake any

benchmarking inquiry.

The only evidence Commerce cites to support the reliability of the Thai value is

the even higher Mexican value of $2,270.49/MT.  I&D Mem. at 40 & n.211 (citation

omitted).  As CAC points out, the Mexican value is derived from a small quantity of

imports, CAC Rule 56.2 Mem. at 38 (citing Pet'rs' Submission of Mexican Surrogate

Values (Sept. 24, 2015) ("Pet'rs' Mexican Submission") at Ex. MEX-1-A, PJA Tab 23,

PR 203, ECF 92-4),[48] suggesting that the Mexican value may itself be unreliable.

Taking into account the entirety of the record, the court cannot conclude that

Commerce's determinations that the Thai import value is reliable, specific, and,

---

[48] CAC asserts that the Mexican value is based upon 33,662 kilograms of imports.  CAC
Rule 56.2 Mem. at 38.  The cited exhibit states that the Mexican value is based upon
33,662 liters of imports, not kilograms.  Pet'rs' Mexican Submission, Ex. MEX-1-A.  In
any case, using the conversion supplied in the exhibit, 33,662 liters corresponds to
40,074 kilograms, or roughly 40 metric tons, and is a relatively small quantity.  *See id.*

therefore, the "best available" to value Jacobi's coal tar are supported by substantial

evidence.  *See Nippon Steel*, 337 F.3d at 1379 (the court's review must consider "the

record as a whole").  This issue is remanded for reconsideration or further

explanation.[49]

### D.  Financial Ratios

The record contained five sources of potential surrogate financial ratios: (1) 2013

statements from the Philippines; (2) 2014 statements from Malaysia; (3) a 2011

statement from Thai producer Carbokarn; (4) 2014 statements from Mexican chemical

company Mexichem S.A.B. de C.V. ("Mexichem"); and (5) a 2013 statement from

---

[49] One additional point bears addressing.  CAC and M.L. Ball contend that Thai import
data are unreliable on the basis of concerns expressed by the U.S. Trade
Representative and U.S. companies and exporters in several reports about possible
upward manipulation of Thai customs values by Thai Customs officials.  CAC Rule 56.2
Mem. at 18-25; M.L. Ball Rule 56.2 Mem. at 8-10.  At the administrative level,
Commerce responded to these arguments saying that, although the reports speak to
"the general state of Thai Customs practices, CAC has pointed to no evidence on the
record which demonstrates that the specific [surrogate values] relied on . . . are the
result of the alleged Thai Customs practices." I&D Mem. at 18.  The court has, in
several cases, recognized the relevance of the reports to the reliability of Thai import
values, though none remanded Commerce's surrogate value or surrogate country
determination on the basis of the reports.  *See Jacobi (AR7) II*, Slip Op. 18-46, at 42-43
(collecting cases expressing the proposition that the reports, without more, do not
sufficiently detract from Commerce's selection of a particular surrogate value (or
Thailand as the primary surrogate country) so as to find it unsupported by substantial
evidence).  As in *Jacobi (AR7) II*, however, "that 'something more' appears to exist in
this case—at least so much so as to require further inquiry by Commerce than occurred
here." *Id.* at 43.  That "something more" is the collection of high Thai surrogate values
Commerce has selected in this case that presently lack reasoned explanation and
substantial evidence in the record.  Thus, "[a]lthough the concerns expressed in the
trade reports do not form the sole basis of the court's remand of this issue, they support
the need for a remand for Commerce to further explain its benchmarking methodology
or reconsider its refusal to use [proffered benchmarking] data to test for aberrancy in
light of indications that the Thai value[s are] unusually high." *Id.*

Romanian producer Romcarbon SA ("Romcarbon").  I&D Mem. at 45.  Commerce

ultimately selected Carbokarn's statement over Jacobi's objection that it contains

evidence of countervailable subsidies.  *Id.* at 46-47.[50]

### 1.  Parties' Contentions

Plaintiffs contend that Commerce wrongly selected Carbokarn's financial

statement to value financial ratios because it contains evidence of countervailable

subsidies in the form of tax coupons, and is three years out of date.  Jacobi Rule 56.2

Mem. at 31-34; Jacobi Rule 56.2 Reply at 13-15; M. L. Ball Rule 56.2 Mem. at 14-15;

CAC Rule 56.2 Mem. at 39-40; CAC Rule 56.2 Reply at 11-12.[51]  Jacobi and M. L. Ball

---

[50] Commerce rejected the Philippine and Malaysian statements because those countries are not at the same level of economic development as China, and it had suitable surrogate financial data from the primary surrogate country, Thailand.  I&D Mem. at 45.  Commerce rejected Mexichem's statement because the company does not produce identical or comparable merchandise.  *Id.* at 46.  With regard to Romcarbon, Commerce noted that although the company produces some subject merchandise, its principal activities involve non-comparable merchandise.  *Id.* at 47.  In contrast, Carbokarn produces comparable merchandise.  *Id.*  Although the Romcarbon statement is more contemporaneous with the period of review than the Carbokarn statement, Commerce concluded that the Carbokarn statement's fulfillment of other criteria favored its selection.  *Id.* (noting that the statement is from the primary surrogate country, publically available, and complete).

[51] CAC cites to *Certain Frozen Warmwater Shrimp from Thailand*, 78 Fed. Reg. 50,379 (Dep't Commerce Aug. 19, 2013) (final neg. countervailing duty determination), and accompanying Issues and Decision Mem., C-549-828 (Aug. 12, 2013) ("*Frozen Warmwater Shrimp from Thailand*, I&D Mem.") at 6.  CAC Rule 56.2 Mem. at 40.  Jacobi cites, in pertinent part, to Commerce's Final Results Of Redetermination Pursuant To Court Remand, Court No. 10-00371, Slip Op. 15-37 (July 10, 2015) *available at* http://enforcement.trade.gov/remands/15-37.pdf (last visited April 10, 2018) ("Commerce's Third *Gold East* Redetermination").  *See* Jacobi Rule 56.2 Reply at 13.  The *Gold East* redetermination was conducted pursuant to the CIT's opinion in *Gold East Paper (Jiangsu) Co. v. United States*, 39 CIT____, 61 F. Supp. 3d 1289 (2015).  *See* Commerce's Third *Gold East* Redetermination at 1.  It cites to *Frozen Warmwater*

assert that Commerce should instead select Romcarbon's statement.  Jacobi Rule 56.2

Mem. at 35; ML Ball Rule 56.2 Mem. at 15.  CAC asserts that Commerce should use

the Philippine financial statements.  CAC Rule 56.2 Mem. at 40; CAC Rule 56.2 Reply

at 12-13.

The Government contends that Commerce correctly rejected the Philippine,

Malaysian, and Romanian statements.   Gov. Rule 56.2 Resp. at 53-55.  The

Government further contends that the record lacks evidence that Carbokarn benefitted

"from a specific export program previously found to be countervailable," or that the tax

coupons referenced in Carbokarn's statement relate to a countervailable program.  *Id.*

at 57.

### 2.  Commerce's Selection of Thai Surrogate Financial Ratios Lacks Substantial Evidence

Commerce has discretion to accept or reject financial statements based on

evidence of countervailable subsidies.  *See* I&D Mem. at 46 & n.252 (citation omitted);

19 U.S.C. § 1677b(c)(5)(2015) (affording Commerce discretion to reject surrogate

values "without further investigation if [it] has determined that broadly available export

subsidies existed or particular instances of subsidization occurred with respect to those

[surrogate values]").[52]  *Cf. DuPont Teijin Films v. United States*, 37 CIT____,___, 896 F.

_____

*Shrimp from Thailand* as evidence of Commerce's determinations regarding Thailand's tax coupon program.  *See id.* at 4 & n.17.

[52] Section 1677b(c)(5) came into effect during the pendency of the underlying administrative proceeding.  *See Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015*, 80 Fed. Reg. 46,793, 46,795 (Dep't Commerce Aug. 6, 2015) (clarifying that § 1677b(c)(5) applies "to determinations made on or after August 6, 2015").  The

Supp. 2d 1302, 1311-12 (2013) (sustaining Commerce's decision to reject financial

statements when specific line items reflected receipt of countervailable subsidies).

However, "[t]he Supreme Court has 'frequently reiterated that an agency must cogently

explain why it has exercised its discretion in a given manner . . . .'" *Allied Pac. Food*

*(Dalian) Co. Ltd. v. United States*, 30 CIT 735, 758, 435 F. Supp. 2d 1295, 1314 (2006)

(quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 48 (1983)).  Commerce has not done so here.

        In the Issues and Decision Memorandum, Commerce explained that it "it is our

practice not to reject financial statements based on the grounds that the company

received export subsidies unless we have previously found the specific export subsidy

program to be countervailable."  I&D Mem. at 46 & n.253 (citations omitted).  Commerce

further concluded that the record lacked evidence that the "tax coupon receivables"

identified in Carbokarn's statement "are related to a Thai program previously found

countervailable by the [agency]."  I&D Mem. at 46.  In *Frozen Warmwater Shrimp from*

*Thailand*, however, Commerce "found that the receipt of tax coupons is . . .

countervailable," *Frozen Warmwater Shrimp from Thailand*, I&D Mem. at 6, and, here,

Carbokarn's 2011 statement contains an entry for "[t]ax coupon receivables" in 2010 and

2011, DJAC Jan. 4, 2016 Surrogate Value Submission, Ex. 8B at ECF p. 370.

Commerce's conclusory assertion regarding the absence of evidence that the entry

_____

codification of Commerce's discretion to reject subsidy-tainted financial statements is
not determinative, however, because the provision simply "clarifies [Commerce's]
authority for its existing practice, and does not impose any new requirements on the
parties to [antidumping] proceedings."  *Id.*

"relate[s] to a Thai program previously found countervailable" fails to apprise the court of the agency's reasons for concluding that the entry bears no relation to the similarly named countervailable program.  *See NMB Singapore Ltd.*, 557 F.3d at 1319.  Because the court is, therefore, unable to ascertain whether Commerce reasonably exercised its discretion in this area, the issue is remanded for reconsideration or further explanation. *See* 19 U.S.C. § 1677b(c)(5)(2015); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48.[53]

## IV.   Irrecoverable VAT

In the Issues and Decision Memorandum, Commerce stated that,

> [i]n a typical VAT system, companies do not incur VAT expense for exports. Instead, they receive on export a full rebate of the VAT they pay on purchases of inputs used in the production of exports ("input VAT") and, in the case of domestic sales, the company can credit the VAT it pays on input purchases for those sales against the VAT they collect from customers.

I&D Mem. at 7.  In China, however, "some portion of the input VAT that a company pays on purchases of inputs used in the production of exports is not refunded," which "amounts to a tax, duty or other charge imposed on exports that is not imposed on domestic sales."  *Id.*  Commerce referred to this unrefunded input VAT as "irrecoverable VAT."  *See id.*  Commerce further explained that its adjustment for irrecoverable VAT consists of two steps: "(1) determining the irrecoverable VAT on subject merchandise,

---

[53] Because the suitability of the 2011 Carbokarn statement remains an open question due to the potential presence of countervailable subsidies and Thailand's unresolved status as a significant producer, the court cannot assess whether Commerce reasonably selected the Thai statement in favor of the alternatives.  On remand, Commerce may choose to reevaluate the relative merits of each proposed source of financial ratios.

and (2) reducing U.S. price by the amount determined in step one." *Id*. at 8.  Step one

consists of applying "(1) the FOB ['free on board'] value of the exported good . . . to the

difference between (2) the standard VAT levy rate and (3) the VAT rebate rate

applicable to exported goods." *Id*.  "The first variable, export value, is unique to each

respondent while the rates in (2) and (3), as well as the formula for determining

irrecoverable VAT, are each explicitly set forth in Chinese law and regulations." *Id*.

In step one, Commerce determined that "VAT is levied on inputs at a rate of 17

percent and for activated carbon there is no VAT rebate." I&D Mem. at 8 & n.48

(citation omitted).  Thus, Commerce concluded, "the irrecoverable rate is equal to the

full VAT percentage." *Id*. at 8.  Additionally, Commerce determined that "a significant

percentage" of Jacobi's entered values were not a reliable proxy for the FOB value of

the exported good to which it applies the irrecoverable VAT rate. *Id*. at 9-10 & n.55

(citation omitted).  In those instances, Commerce applied the irrecoverable VAT

adjustment to an "estimated customs value," which Commerce defined as "ex-factory

net U.S. price plus foreign movement expenses." *Id*. at 9.

### A.  Parties' Contentions

Jacobi contends that Commerce's VAT adjustment should be remanded for the

same reasons the court remanded the matter in *Jacobi (AR7) I*.  Jacobi Rule 56.2 Reply

at 16-17.  Jacobi further contends that Commerce's reliance on an estimated customs

value lacks any factual basis or reasoned explanation as to why an estimated customs

value more accurately reflects a FOB value.  Jacobi Rule 56.2 Mem. at 41-44;[54] *see also* M.L. Ball Rule 56.2 Mem. at 16-18 (advancing the same arguments).  Cherishmet contends that Commerce's VAT calculation lacks substantial evidence because the standard VAT levy rate is applied to the cost of inputs, whereas the rebate rate is applied to the cost of the finished goods.  Cherishmet Rule 56.2 Mem. at iii-iv.  The Government contends that Commerce's VAT adjustment is supported by substantial evidence.  Gov. Rule 56.2 Resp. at 62-67.

### B. Commerce's VAT Adjustment Lacks Substantial Evidence

On two occasions the court has addressed Commerce's irrecoverable VAT adjustment; each time, the court has remanded the adjustment for reconsideration or further explanation.  The same result is merited here.

In *Jacobi (AR7) I*, the court found that Commerce properly may adjust for irrecoverable VAT.  222 F. Supp. 3d at 1186-88.  The court, however, remanded Commerce's VAT calculation as lacking in substantial evidence.  *Id.* at 1192-94.  The court pointed to Commerce's identification of the irrecoverable VAT as unrefunded "VAT paid on inputs and raw materials (used in the production of exports)," *id.* at 1193 (citing I&D Mem. at 16-17, 20), and reasoned that Commerce's calculation of irrecoverable VAT on the basis of the price of the finished good potentially overstated the adjustment,

---

[54] Jacobi and M.L. Ball also challenged Commerce's legal authority to deduct irrecoverable VAT.  Jacobi Rule 56.2 Mem. at 36-40; M.L. Ball Rule 56.2 Mem. at 16. Citing the court's opinion in *Jacobi (AR7) I*, Jacobi abandoned that challenge in its reply. Jacobi Rule 56.2 Reply at 16-17.  M. L. Ball did not file a reply; however, its arguments do not persuade the court to revisit the issue.

*id.* at 1193-94.  On remand, Commerce again defined irrecoverable VAT as "VAT paid

on <u>inputs </u>used in the production of exports that is non-refundable."  *Jacobi (AR7) II*, Slip

Op. 18-46, at 54 (citation omitted) (emphasis added).  That definition notwithstanding,

the agency calculated the adjustment on the basis of the 17 percent <u>output </u>VAT Jacobi

collects from its foreign customers.  *Id.* at 55-56.  The court remanded the issue for

Commerce "to reconcile its calculation methodology with the theory underlying the

irrecoverable VAT adjustment."  *Id.* at 56-57 (reasoning that "Commerce's reliance on

Jacobi's output VAT rate applied to U.S. price [failed to] constitute[] substantial evidence

supporting an adjustment perhaps based upon unrefunded input VAT as Commerce

explained").

Evidence submitted on the record of this segment of the proceeding persuades

the court that Commerce's adjustment suffers from the same concerns the court

identified in *Jacobi (AR7) I*.  Indeed, at oral argument, the Government stated that there

are no material differences regarding its VAT calculations between the seventh and

eighth administrative reviews.  Oral Arg. at 1:56:37-1:56:51.  Accordingly, the issue is

remanded for Commerce to reconsider or further explain its irrecoverable VAT

adjustment in accordance with *Jacobi (AR7) I* and *Jacobi (AR7) II*.[55]

## CONCLUSION

In accordance with the foregoing, it is hereby

---

[55] The court defers ruling on Jacobi's challenge to Commerce's reliance on an
estimated customs value as a FOB proxy pending Commerce's redetermination.

**ORDERED** that Commerce's *Final Results* are sustained with respect to the issue of economic comparability, as set forth in Discussion Section II.A above; it is further

**ORDERED** that Commerce's *Final Results* are remanded to further address the issue of significant production, as set forth in Discussion Section II.B above; it is further

**ORDERED** that Commerce's *Final Results* are remanded with respect to its surrogate value selections, as set forth in Discussion Section III above; it is further

**ORDERED** that Commerce's *Final Results* are remanded to further address the issue of irrecoverable VAT, as set forth in Discussion Section IV above; it is further

**ORDERED** that, in the event Commerce amends the antidumping margin assigned to Jacobi, Commerce reconsider the separate rate assigned to non-mandatory respondents; it is further

**ORDERED** that Commerce shall file its second remand results on or before July 18, 2018; it is further

**ORDERED** that the deadlines provided in USCIT Rule 56.2(h) shall govern thereafter; and it is further

**ORDERED** that any opposition or supportive comments must not exceed 6,000 words.

/s/    Mark A. Barnett
Mark A. Barnett, Judge

Dated: April 19, 2018
New York, New York