Slip Op. 19-28

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JACOBI CARBONS AB AND JACOBI CARBONS, INC.,<br>　　　　　　　　Plaintiffs,<br><br>　　　and<br><br>NINGXIA HUAHUI ACTIVATED CARBON CO., LTD., et al.,<br>　　　　　　　　Plaintiff-Intervenors,<br><br>　　　v.<br><br>UNITED STATES,<br>　　　　　　　　Defendant,<br><br>　　　and<br><br>CALGON CARBON CORP. AND CABOT NORIT AM., INC,<br>　　　　　　　　Defendant-Intervenors. | Before: Mark A. Barnett, Judge<br>Consol. Court No. 16-00185 |

## OPINION AND ORDER

[The U.S. Department of Commerce's Second Remand Results are remanded with respect to the agency's primary surrogate country selection and sustained with respect to the agency's value-added tax adjustment.]

Dated:  March 5, 2019

Daniel L. Porter and Tung A. Nguyen, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for Plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc.

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, DeKieffer & Horgan, PLLC, of Washington, DC, for Plaintiff-Intervenors Carbon Activated Corporation, Ningxia Mineral and Chemical Ltd., Shanxi DMD Corporation, Shanxi Industry

Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tianjin Channel Filters Co. Ltd., and Tianjin Maijin Industries Co., Ltd.

Mollie L. Finnan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant.  With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director.  Of counsel on the brief was Emma T. Hunter, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

R. Alan Luberda, John M. Herrmann, David A. Hartquist, Melissa M. Brewer, and Kathleen M. Cusack, Kelley Drye & Warren LLP, of Washington, DC, for Defendant-Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc.

Barnett, Judge:  This matter is before the court following the U.S. Department of

Commerce's ("Commerce" or "the agency") second redetermination upon remand in this

case.  See Final Results of Redetermination Pursuant to Court Remand ("2nd Remand

Results"), ECF No. 124-1.

Plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc. (together, "Jacobi") and

Plaintiff-Intervenors[1] (collectively, "Plaintiffs") challenged several aspects of

Commerce's final results in the eighth administrative review of the antidumping duty

---

[1] Plaintiff-Intervenors include Carbon Activated Corporation, Ningxia Mineral and Chemical Limited, Shanxi DMD Corporation, Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tianjin Channel Filters Co., Ltd., and Tianjin Maijin Industries Co., Ltd. (collectively, "CAC"); Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd., and Datong Municipal Yunguang Activated Carbon Co., Ltd (collectively, "Cherishmet"); Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui"); and M.L. Ball Co., Ltd., and Jilin Bright Future Chemicals Company, Ltd. (together, "M.L. Ball").  The court consolidated cases filed by CAC, Cherishmet, and M.L. Ball under lead Court No. 16-00185, filed by Jacobi.  See Order (Nov. 3, 2016), ECF No. 42.  Those parties, along with Huahui, had also intervened in this action.  See Order (Oct. 7, 2016), ECF No. 17; Order (Oct. 12, 2016), ECF No. 22; Order (Oct. 20, 2016), ECF No. 36; Order (Oct. 20, 2016), ECF No. 40.

order ("AD Order") on certain activated carbon from the People's Republic of China

("PRC" or "China").   *See Certain Activated Carbon from the People's Republic of China,*

81 Fed. Reg. 62,088 (Dep't of Commerce Sept. 8, 2016) (final results of antidumping

duty admin. review; 2014-2015) ("*Final Results*"), ECF No. 44-4, and accompanying

Issues and Decision Mem., A-570-904 (Aug. 31, 2016) ("I&D Mem."), ECF No. 44-5. [2]

Specifically, Plaintiffs challenged Commerce's selection of Thailand as the primary

surrogate country and Thai surrogate values for carbonized material, hydrochloric acid,

coal tar, and financial ratios, and Commerce's adjustment to Jacobi's constructed export

price to account for irrecoverable value-added tax ("VAT").   *See, e.g.*, Confidential

Consol. Pls. Jacobi Carbons AB and Jacobi Carbons, Inc.'s Mot. for J. Upon the Agency

R. and Br. in Supp. of Mot. for J. on the Agency R., ECF No. 48; Consol. Pls. Carbon

Activated Corporation, Ningxia Mineral and Chemical Limited, Shanxi DMD Corporation,

Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd.,

Tianjin Channel Filters Co., Ltd., and Tianjin Maijin Industries Co., Ltd. Mem. in Supp. of

Mot. for J. on the Agency R., ECF No. 53.

---

[2] The administrative record filed in connection with the *Final Results* is divided into a
Public Administrative Record ("PR"), ECF No. 44-3, and a Confidential Administrative
Record ("CR"), ECF No. 44-2.  The administrative record associated with the 2nd
Remand Results is contained in a Public Remand Record, ECF No. 125-3, and a
Confidential Remand Record, ECF No. 125-2.  Parties submitted joint appendices
containing record documents cited in their remand briefs.  *See* J.A. to Parties'
Comments on Second Remand Redetermination ("PRJA"), ECF No. 133; Confidential
Suppl. App. to Comments on Second Remand Redetermination ("CRJA"), ECF No. 135.
These appendices supplement the documents previously provided.  *See* Public J.A.
("PJA"), ECF No. 92; Confidential J.A. ("CJA"), ECF No. 91.

On June 20, 2017, the court granted Commerce's request for a remand to clarify

or reconsider its findings regarding economic comparability and Thailand's status as a

significant producer of comparable merchandise based on its export quantity.  *See*

Order (June 20, 2017), ECF No. 77.[3]  On September 5, 2017, Commerce issued its first

remand redetermination.  *See* Final Results of Redetermination Pursuant to Court Order

(Sept. 1, 2017) ("1st Remand Results"), ECF No. 78-1.  Therein, Commerce further

explained its methodology for determining which countries are at the same level of

economic development as the PRC and relied on evidence of domestic production

rather than exports to support its significant producer determination.  *Id.* at 3-21.  On

April 19, 2018, following briefing and oral argument on the *Final Results* as amended by

the 1st Remand Results, the court sustained Commerce's economic comparability

determination while remanding the agency's determination that Thailand is a significant

producer of comparable merchandise, irrecoverable VAT adjustment, and surrogate

value selections.  *See Jacobi Carbons AB v. United States* ("*Jacobi (AR8) I*"), 42 CIT

___, 313 F. Supp. 3d 1344 (2018).[4]

---

[3] Commerce's request was prompted by the court's resolution of those issues in
connection with the seventh administrative review of the AD Order on activated carbon.
*See* Def.'s Mot. for a Voluntary Remand, ECF No. 72; *Jacobi Carbons AB v. United
States* ("*Jacobi (AR7) I*"), 41 CIT ___, 222 F. Supp. 3d 1159 (2017).  In that opinion, the
court held that Commerce's economic comparability determination lacked reasoned
analysis and the agency had failed to persuade that total exports, absent evidence
regarding the influence of those exports on world trade, was a permissible method of
construing the term "significant producer."  *Jacobi (AR7) I*, 222 F. Supp. 3d at 1176-82.
[4] *Jacobi (AR8) I* presents background information on this case, familiarity with which is
presumed.

On October 24, 2018, Commerce filed the remand redetermination at issue here. *See* 2nd Remand Results.  Therein, Commerce circled back to export quantity as its basis for finding that Thailand is a significant producer of comparable merchandise, *see id.* at 4-7; further explained its selection of Thai surrogate values for carbonized material and hydrochloric acid, *see id.* at 8-15; revised its surrogate value selections for coal tar and financial ratios using data from South Africa and Romania, respectively, *see id.* at 16-19, 20-24; and reconsidered the basis for its VAT adjustment while continuing to adjust Jacobi's constructed export price for VAT, *see id.* at 26-37.  Commerce's redetermination reduced Jacobi's weighted-average dumping margin from $1.756 per kilogram to $0.44 per kilogram.  *Compare id.* at 51, *with Final Results*, 81 Fed. Reg. at 62,089.  The reduction in Jacobi's margin also reduced the weighted-average dumping margin assigned to the non-individually-examined respondents eligible for a separate rate from $1.357 per kilogram to $0.34 per kilogram.  *Compare* 2nd Remand Results at 52, *with Final Results*, 81 Fed. Reg. at 62,089.

Jacobi and CAC filed comments opposing the 2nd Remand Results with respect to Thailand as a significant producer, the surrogate values selected for carbonized material and hydrochloric acid, and the VAT adjustment.  *See* Pls.' Comments on Commerce's Second Remand Determination ("Jacobi's Opp'n Cmts."), ECF No. 127; Consol. Pls. Carbon Activated Corporation, Ningxia Mineral and Chemical Limited, Shanxi DMD Corporation, Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tianjin Channel Filters Co., Ltd., and Tianjin Maijin Industries Co., Ltd. Comments in Opp'n to Second Remand ("CAC's Opp'n Cmts."),

ECF No. 126.  No party challenged the 2nd Remand Results with respect to the

surrogate values selected for coal tar or the financial ratios.  Defendant United States

("the Government") and Defendant–Intervenors Calgon Carbon Corp. and Cabot Norit

Americas, Inc. ("Calgon") filed comments in support of the 2nd Remand Results.

*See* Def.'s Reply to Comments on the Second Remand Results ("Def.'s Reply Cmts."),

ECF No. 131; Def.–Ints.' Comments in Supp. of U.S. Department of Commerce Second

Remand Redetermination ("Def–Ints.' Reply Cmts."), ECF No. 132.

For the following reasons, the court remands Commerce's determination that

Thailand is a significant producer of comparable merchandise and directs Commerce to

reconsider its selection of a primary surrogate country.  Because Commerce relied, in

part, on its preference to use data from the primary surrogate country when making its

surrogate value selections for carbonized material and hydrochloric acid, *see* 2nd

Remand Results at 7, 15, the court also remands Commerce's surrogate value

selections.  The court sustains Commerce's VAT adjustment.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of 1930,

as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii)(2012),[5] and 28 U.S.C. § 1581(c)(2012).

The court will uphold an agency determination that is supported by substantial

evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  The

---

[5] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and all references to the United States Code are to the 2012 edition, unless otherwise stated.

court's review of Commerce's interpretation and implementation of a statutory scheme is guided by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984).  *See Apex Frozen Foods Private Ltd. v. United States,* 862 F.3d 1322, 1329 (Fed. Cir. 2017).  First, the court must determine "whether Congress has directly spoken to the precise question at issue."  *Id.* (quoting *Chevron,* 467 U.S. at 842).  If Congress's intent is clear, "that is the end of the matter," and the court "must give effect to the unambiguously expressed intent of Congress."  *Id.* (quoting *Chevron,* 467 U.S. at 842-43).  Only "if the statute is silent or ambiguous," must the court determine whether the agency's action "is based on a permissible construction of the statute."  *Id.* (quoting *Chevron,* 467 U.S. at 843).  Additionally, "[t]he results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order." *SolarWorld Ams., Inc. v. United States*, 41 CIT ___, ___, 273 F. Supp. 3d 1314, 1317 (2017) (internal quotation marks and citation omitted).

## DISCUSSION

I.  **Significant Producer of Comparable Merchandise**

   A.  **Legal Framework**

   An antidumping duty is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673. When an antidumping duty proceeding involves a nonmarket economy country, Commerce determines normal value by valuing the factors of production[6] in a surrogate

---

[6] The factors of production include but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities

country, *see id.* § 1677b(c)(1), and those values are referred to as "surrogate values."

In selecting surrogate values, Commerce must use "the best available information" that

is, "to the extent possible," from a market economy country or countries that are

economically comparable to the nonmarket economy country and are "significant

producers of comparable merchandise." *Id.* § 1677b(c)(1), (4).  Commerce generally

values all factors of production in a single surrogate country.[7]

Commerce has adopted a four-step approach to selecting a primary surrogate

country.   Pursuant thereto:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate
> countries that are at a comparable level of economic development to the
> [non-market economy] country; (2) Commerce identifies countries from the
> list with producers of comparable merchandise; (3) Commerce determines
> whether any of the countries which produce comparable merchandise are
> significant producers of that comparable merchandise; and (4) if more
> than one country satisfies steps (1)–(3), Commerce will select the country
> with the best factors data.

*Jiaxing Brother Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir.

2016) (citation omitted); *see also* Import Admin., U.S. Dep't of Commerce, Non-Market

Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), *available at*

http://enforcement.trade.gov/policy/bull04–1.html (last visited Feb. 27, 2019) ("Policy

Bulletin 04.1").

---

consumed, and (D) representative capital cost, including depreciation." 19 U.S.C.
§ 1677b(c)(3).

[7] *See* 19 C.F.R. § 351.408(c)(2) (excepting labor).  *But see Antidumping Methodologies
in Proceedings Involving Non-Market Economies: Valuing the Factor of Production:
Labor*, 76 Fed. Reg. 36,092 (Dep't Commerce June 21, 2011) (expressing a preference
to value labor based on industry-specific labor rates from the primary surrogate
country).

Neither the statute nor Commerce's regulations define "significant producer."  *See* 19 U.S.C. § 1677b; 19 C.F.R. § 351.408.  However, in its Policy Bulletin 04.1, Commerce described its practice for evaluating significant producer countries:

> [t]he extent to which a country is a *significant* producer should not be judged against the [subject non-market economy] country's production level or the comparative production of the five or six countries [that are considered potential surrogate countries].  Instead, a judgement [*sic*] should be made consistent with the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics).  Since these characteristics are specific to the merchandise in question, the standard for "significant producer" will vary from case to case.  For example, if . . . there are ten large producers and a variety of small producers, "significant producer" could be interpreted to mean one of the top ten.  If, in the example above, there is also a middle-size group of producers, then "significant producer" could be interpreted as one of the top ten or middle group.  In another case, there may not be adequate data available from major producing countries.  In such a case, "significant producer" could mean a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers.

Policy Bulletin 04.1 at 3.

Because the term is otherwise undefined and ambiguous, the court must assess whether Commerce's interpretation of significant producer "is based on a permissible construction of the statute."  *Apex Frozen Foods*, 862 F.3d at 1329 (quoting *Chevron*, 467 U.S. at 843).  To effectuate judicial review, Commerce must provide "a reasoned analysis or explanation for [its] decision" so the court may "determine whether a particular decision is arbitrary, capricious, or an abuse of discretion."  *Thai I-Mei Frozen Foods Co., Ltd. v. United States*, 616 F.3d 1300, 1304 (Fed. Cir. 2010) (citation omitted).

### B.  Commerce's Interpretation of "Significant Producer" in This Proceeding

The 2nd Remand Results reflect Commerce's third effort to justify its determination that Thailand is a significant producer of comparable merchandise. Therein, Commerce explained that it would "compar[e] data for comparable merchandise to establish whether any country that is at the same level of economic development as [the PRC] was: a) a *significant net exporter*; or b) a *major exporter to the United States*."  2nd Remand Results at 5-6 & n.25 (citing *Yantai Oriental Juice Co. v. United States*, 27 CIT 477, 481 (2003)) (emphasis added).  To that end, Commerce noted that the record contained Global Trade Atlas ("GTA") import and export data for the potential surrogate countries as well as Malaysia and the Philippines, and 2014 UNCOMTRADE data for 65 activated carbon exporting countries.  *Id.* at 6.  The GTA data indicated that Malaysia and the Philippines were net exporters, but Thailand was not.  *Id.*  Commerce did not, however, examine whether Thailand (or any of the potential surrogate countries) was "a major exporter to the United States," its stated alternative metric for evaluating significant production.  *See id.*  Rather, Commerce discussed Thailand's total global exports.  *See id.* at 6-7.

Commerce prefaced its discussion of export quantity by explaining that although "[t]he [c]ourt has suggested that significant production means production 'having or likely to have influence or effect' on world trade[,] . . . Commerce instead interprets 'significant' to mean a noticeably or measurably large amount."  *Id.* at 6 & n.31 (quoting *Jacobi (AR8) I*, 313 F. Supp. 3d at 1358 & n.26).  According to the 2014 UNCOMTRADE and GTA data sets, Thailand exported more than nine million kilograms

("kg") of activated carbon worldwide.  *See id.* at 6 & n.32 (citations omitted).  Commerce characterized this amount as "noticeably or measurably large."  *Id.* at 7.  Commerce further characterized Thailand as "among the top global exporters of activated carbon" because it is the 14th largest global exporter of activated carbon according to the 2014 UNCOMTRADE data, with 51 countries exporting less than Thailand, and 38 countries exporting less than one million kilograms.[8]  *Id.* at 7, 39.  Thailand also was the largest exporter among the potential surrogate countries.  *Id.* at 7.  Commerce relied on this evidence to conclude that Thailand is a significant producer of comparable merchandise.  *See id.* at 7, 38, 39-40.

### C.  Parties' Contentions

CAC contends that Commerce's interpretation of significant as "noticeably or measurably large" is "unreasonably subjective."  CAC's Opp'n Cmts. at 4.  CAC also contends that the 2014 UNCOMTRADE data show that the top nine countries on the list may be considered "significant exporters" and, thereafter, the remaining countries, including Thailand, each account for less than two percent of total global exports.  *Id.* at 6-7.  CAC further contends that Thailand's status as a net importer undermines Commerce's reliance on total exports.  *Id.* at 4-5.[9]

---

[8] The 2014 UNCOMTRADE data show that 40 countries exported less than one million kilograms of activated carbon, and 38 countries exported less than one million U.S. dollars' worth.  *See* Jacobi's Comments on Economic Comparability (July 20, 2015) ("Jacobi's EC Cmts."), Attach. E, PR 82-83, PJA Tab 18, ECF No. 92-3 (2014 UNCOMTRADE data).  This minor error does not impact the court's analysis.

[9] Jacobi did not comment on this issue.

The Government and Calgon contend that Commerce has permissibly interpreted an ambiguous statutory term and the 2014 UNCOMTRADE data provide substantial evidence that Thailand is a significant producer.  Def.'s Reply Cmts. at 5-6; Def.-Ints.' Reply Cmts. at 7-8.

### D.  Commerce's Determination is Remanded for Reconsideration

Upon consideration of the agency's second remand redetermination and the briefing to the court, Commerce's finding that Thailand is a significant producer must be remanded.  Commerce has effectively divorced the term "significant" from the term "production" and applied its interpretation of "significant" without the context and explanation necessary to ensure that its determination is not arbitrary.  Although Commerce is within its discretion to define "significant" as "noticeably or measurably large," *see Juancheng Kangtai Chem. Co., Ltd. v. United States*, Slip Op. 17-3, 2017 WL 218910, at *4 (CIT Jan. 19, 2017) (holding that Commerce's corresponding interpretation of the term "significant" merited *Chevron* deference), Commerce has not supplied the court with a well-reasoned explanation supporting its consideration of total exports as a substitute for production.  Overall, the agency has failed to interpret or apply the statutory criterion in its entirety and has not supported its determination that Thailand is a significant producer with substantial evidence.

Commerce's Policy Bulletin 04.1 does not discuss the use of total exports to identify significant producers.  It indicates that, in the absence of production data, a "'significant producer' *could* mean a country that is a *net* exporter."  Policy Bulletin 04.1 at 3 (emphasis added); *cf.* H.R. Rep. No. 100–576, at 590 (1988) (Conf. Rep.), *reprinted*

*in* 1988 U.S.C.C.A.N. 1547, 1623 ("The term 'significant producer' includes any country that is a significant net exporter.").[10]  The use of net exports provides at least some assurance that a country's exports do not consist entirely of transshipped imports. When a country imports more than it exports, that assurance is lacking.  Here, Thailand imported 696,685 kg more activated carbon than it exported during the relevant period. *See* Pet'rs' Comments on Surrogate Country Selection (Aug. 31, 2015), Attach. 4, PR 155, PJA Tab 33, ECF No. 92-5 (Thailand's import and export quantities).  Commerce's failure to address this aspect of the record undermines its reliance on total exports as a substitute for production.  *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (the court's review must consider "the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence") (internal quotation marks and citation omitted).[11]

Commerce also failed to adequately explain its determination that Thailand's total export quantity was significant.  While Commerce appears to suggest that countries ranked among the top 15 exporters represent the "top global exporters," *see* 2nd Remand Results at 7, 39, the lack of further explanation or any clear delineation

---

[10] While Commerce correctly notes that the legislative history's reference to significant net exports does not preclude reliance on other metrics, 2nd Remand Results at 5, Commerce must still explain why its chosen metric represents a permissible construction of the term "significant producer."

[11] Indeed, in the case upon which Commerce relied to support its consideration of significant net exports and major exports to the United States, the agency explained that India was not a significant producer because it did not fulfill either of those criteria *and* was a net importer of subject merchandise.  *See Yantai*, 27 CIT at 481; 2nd Remand Results at 6 & n.25.

between countries ranked proximately above and below 15 leaves the court unable to

discern the reasons for Commerce's conclusion. *See NMB Singapore Ltd. v. United

States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009) (noting that although Commerce's

"explanations do not have to be perfect, the path of Commerce's decision must be

reasonably discernable to a reviewing court"); Jacobi's EC Cmts., Attach. E.[12]

Commerce's seemingly arbitrary delineation contrasts with Policy Bulletin 04.1's

recognition of the contextual nature of the significant producer determination and

corresponding examples that evaluate significance in terms of the particular

characteristics of overall global trade in the subject merchandise.  *See* Policy Bulletin

04.1 at 3 (noting, "[f]or example, [that] if there are just three producers of comparable

merchandise in the world, then arguably any commercially meaningful production is

significant").

Commerce's assertion that Thailand's export quantity is "noticeably large" in

comparison to countries exporting less than one million kilograms is also unavailing.

*See* 2nd Remand Results at 39.  While perhaps true, the import of this observation for

---

[12] CAC asserts that the line between significant and insignificant exports is more
suitably drawn after Mozambique, ranked ninth with 35,035,750 kg of activated carbon
exports, because the volume of exports decreases thereafter to roughly 15,000,000 kg,
or from five to ten percent of global exports to one to two percent of global exports.
CAC's Opp'n Cmts. at 6.  The Government and Calgon respond to CAC's assertion by
attempting to place Thailand within the "middle-sized group of producers" contemplated
by Policy Bulletin 04.1.  *See* Def.'s Reply Cmts. at 6; Def.-Ints.' Reply Cmts. at 8; Policy
Bulletin 04.1 at 3.  Regardless of the degree of merit in the Government's and Calgon's
approach to interpreting the available evidence, it departs from Commerce's decision,
and the court may not accept "*post hoc* rationalizations for agency action."  *Burlington
Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962).

purposes of Commerce's significant producer determination is unclear.  For example,

Chile's export quantity of 2,200 kg is "noticeably larger" than El Salvador's 41 kg export

quantity.  *See* Jacobi's EC Cmts., Attach. E.  Chile, which is ranked 60th and accounts

for roughly 0.00027 percent of total global production, would not be considered a

significant producer on the basis of export quantity.  *See id.*  Commerce's reliance on

particular rankings or isolated data points highlights the relevance of appropriate

contextual analysis in order to determine whether descriptors such as "large" or

"significant" reasonably apply.

Lastly, Commerce's reliance on Thailand's status as "the largest exporter of

activated carbon among the countries identified as being at the same level of economic

development as China" lacks merit.  *See* 2nd Remand Results at 7.  As the Government

points out, Commerce's practice is *not* to evaluate "[t]he extent to which a country is a

*significant* producer . . . against . . . the comparative production of the five or six

countries on [Commerce's] surrogate country list."  Def.'s Reply Cmts. at 6 (quoting

Policy Bulletin 04.1 at 3).  Commerce's policy recognizes that a country's level of

economic development is irrelevant to whether that country's production (or exports) of

a given product may be considered "significant."  Nevertheless, while Commerce is not

irrevocably committed to this statement of policy, its diametrically opposite approach in

this case, absent any explanation, cannot be sustained.  Accordingly, Thailand's ranking

among this group of countries is not substantial evidence that Thailand is a significant

producer of comparable merchandise.

Commerce has now had three opportunities to justify its selection of Thailand as the primary surrogate country.  Once again, Commerce has failed to provide a reasoned explanation or substantial evidence supporting its determination that Thailand is a significant producer of comparable merchandise.  Commerce's reliance on Thailand's export quantity and various rankings among global exporters is untethered to its own statements of practice regarding the significant producer determination and appears arbitrary.  While Commerce is not bound by its statements of practice, it must explain its departures therefrom and has seemed unable.  Therefore, the court finds that the record does not support the selection of Thailand as a significant producer.  On remand, Commerce must identify a surrogate country, whether from its list of countries at the same level of economic development as the PRC or another country at a comparable level of economic development not on the list, which meets the statutory criteria and is supported by substantial evidence.  Because Commerce justified its selection of surrogate values for carbonized material and hydrochloric acid, in part, on the basis that they are derived from Thailand as the primary surrogate, Commerce must revisit these surrogate values on remand.

## II.   Value-Added Tax

### A.  The Application of Section 1677a(c)(2)(B) to Nonmarket Economies

When calculating export price and constructed export price, Commerce may deduct "the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in section

1677(6)(C) of this title."[13]  19 U.S.C. § 1677a(c)(2)(B).  Such price adjustments must be

"reasonably attributable to the subject merchandise."  19 C.F.R. § 351.401(c).

Prior to 2012, Commerce did not apply 19 U.S.C. § 1677a(c)(2)(B) in

proceedings involving imports from nonmarket economy ("NME") countries.  Commerce

reasoned that "pervasive government intervention in NMEs precluded proper valuation

of taxes paid by NME respondents to NME governments."  *Methodological Change for*

*Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain*

*Non–Market Economy Antidumping Proceedings*, 77 Fed. Reg. 36,481, 36,482 (Dep't

Commerce June 19, 2012) ("*Methodological Change*") (citing *Pure Magnesium and*

*Alloy Magnesium From the Russian Federation*, 60 Fed. Reg. 16,440 (Dep't Commerce

Mar. 30, 1995) (notice of final determination of sales at less than fair value) ("*Pure*

*Magnesium from Russia*")).  Commerce had taken the position that nonmarket economy

countries are

> governed by a presumption of widespread intervention and influence in
> the economic activities of enterprises[ and a]n export tax charged for one
> purpose may be offset by government transfers provided for another
> purpose. . . . To make a deduction for export taxes imposed by a NME
> government would unreasonably isolate one part of the web of
> transactions between government and producer.

*Id.* (citation omitted).  Commerce's declination to apply section 1677a(c)(2)(B) in NME

proceedings accorded with its former practice of declining to countervail subsidies paid

by a NME government to a NME producer.  *See id.*  Commerce reasoned that

---

[13] Section 1677(6)(C) concerns "export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received" and is not relevant here.

"[a]ttempts to isolate individual government interventions in this setting—whether they

be transfers from the government or from exporters to the government—make no

sense." *Id.* (citation omitted).

As the countries that Commerce considered to be nonmarket economies

evolved, so did Commerce's practices.  In 2002, Commerce revoked Russia's status as

a NME country.  *See Silicon Metal From the Russian Federation*, 68 Fed. Reg. 6,885,

6,887 (Dep't Commerce Feb. 11, 2003) (notice of final determination of sales at less

than fair value) (citation omitted).  In 2007, Commerce determined that China (and

Vietnam), while still regarded as NME countries, had nevertheless become sufficiently

dissimilar from the centrally-planned economies of the Soviet-era such that Commerce

could determine whether those governments bestowed countervailable subsidies on

certain companies or industries.  *See Methodological Change*, 77 Fed. Reg. at 36,482;

Issues and Decision Mem. for the Final Determination in the Countervailing Duty

Investigation of Coated Free Sheet Paper from the People's Republic of China, C-570-

907 (Oct. 17, 2007) at Cmt. 1, *available at* https://enforcement.trade.govfrn/summary

/prc/E7-21046-1.pdf (last visited Feb. 27, 2019).[14]  In accordance with its determination

that countervailable subsidies from China and Vietnam could be measured, Commerce

---

[14] Commerce's initial application of the countervailing duty laws to NME countries was
challenged in court and held unlawful.  *See GPX Int'l Tire Corp. v. United States*, 666
F.3d 732, 745 (Fed. Cir. 2011), *reh'g granted*, 678 F.3d 1308 (Fed. Cir. 2012).
However, Congress subsequently amended the statute to confirm that Commerce was
authorized to apply the countervailing duty laws to nonmarket economy countries.  *See*
Application of Countervailing Duty Provisions to NonMarket Economy Countries, Pub. L.
No. 112–99, 126 Stat. 265 (2012); 19 U.S.C. §§ 1671(f), 1677f–1(f).

reconsidered whether taxes, duties and other charges paid by NME producers to those NME governments could likewise be identified and measured.  *See Methodological Change*, 77 Fed. Reg. at 36,482.

In 2012, Commerce concluded that it could now identify and measure certain taxes paid by Chinese producers to the Chinese government and announced that, henceforth, it would consider whether the PRC "has imposed an export tax, duty, or other charge upon export of the subject merchandise during the period of investigation or the period of review," including, for example, "an export tax or VAT that is not fully refunded upon exportation."  *Id.* at 36,482 (internal quotation marks omitted).  Thus, when the PRC does so, and "the respondent was not exempted, [Commerce] will reduce the respondent's export price and constructed export price accordingly, by the amount of the tax, duty or charge paid, but not rebated."  *Id.* at 36,483.  When "the export tax, VAT, duty, or other charge" is "a fixed percentage of the price," Commerce announced that it would "adjust the export price or constructed export price downward by the same percentage."  *Id.*  "[B]ecause these are taxes affirmatively imposed by the Chinese . . . government[]," Commerce "presume[s] that they are also collected."  *Id.*

## B.  Commerce's Application of the Statute to Chinese VAT

Pursuant to the *Methodological Change*, for the *Final Results*, Commerce reduced Jacobi's constructed export price by an amount it described as "irrecoverable VAT."  I&D Mem. at 7.  According to Commerce, irrecoverable VAT constituted an "export tax, duty, or other charge" pursuant to section 1677a(c)(2)(B) because it represented the amount of VAT Jacobi paid on inputs and raw materials used in the

production of activated carbon ("input VAT") that was nonrefundable when those inputs

and raw materials were consumed in the production of exported subject merchandise.

*Id.* at 7-8.[15]  Commerce calculated irrecoverable VAT by multiplying the free on board

("FOB") value of the subject merchandise by the difference between the standard VAT

rate (here, 17 percent) and the applicable VAT rebate rate (here, zero).  *Id*. at 8.  When

Jacobi's entered values were less than an "estimated customs value," which Commerce

defined as "ex-factory net U.S. price plus foreign movement expenses," Commerce

applied the irrecoverable VAT rate to the estimated customs value as a proxy for the

FOB China port value.  *Id*. at 9-10.

        In *Jacobi (AR8) I*, the court remanded the VAT adjustment for reconsideration in

accordance with its resolution of this issue in the seventh administrative review.[16]  313

F. Supp. 3d at 1373.  In that proceeding, the court found that section 1677a(c)(2)(B)

was ambiguous.  *See Jacobi (AR7) I*, 222 F. Supp. 3d at 1186–87.  Because the statute

is ambiguous, pursuant to *Chevron* prong two, Commerce could reasonably determine

that an input VAT that becomes nonrefundable when the finished product is exported

---

[15] Commerce explained that

> [i]n a typical VAT system, companies do not incur VAT expense for
> exports.  Instead, they receive on export a full rebate of the VAT they pay
> on purchases of inputs used in the production of exports ("input VAT"),
> and, in the case of domestic sales, the company can credit [input VAT] . . .
> against the VAT they collect from customers ["output VAT"].

I&D Mem. at 7.  In the PRC, however, "some portion of the input VAT that a company
pays on purchases of inputs used in the production of exports is not refunded."  *Id.*
[16] The Government had acknowledged that there were no material differences in
Commerce's VAT calculations in the seventh and eighth administrative reviews.  *See
Jacobi (AR8) I*, 313 F. Supp. 3d at 1373.

constitutes, at the very least, an "other charge" that is "imposed by the exporting country

on the exportation of the subject merchandise" because it remains recoverable (as a

credit or offset against output VAT) until the product is exported.  *Id.*  The court further

found that Commerce's determination that certain of Jacobi's entered values were

unreliable was supported by substantial evidence and thus affirmed its use of estimated

customs values.  *Id.* at 1190–92.  The court, however, remanded Commerce's VAT

calculation because the agency's application of the irrecoverable VAT rate to the price

of the finished good potentially overstated an adjustment intended to account for

unrefunded input VAT.  *Id.* at 1192-94.

        In its first redetermination in the seventh administrative review, Commerce

continued to characterize its adjustment as accounting for irrecoverable VAT (i.e.,

unrefunded input VAT).  *See Jacobi Carbons AB v. United States* ("*Jacobi (AR7) II*"), 42

CIT ___, 313 F. Supp. 3d 1308, 1341 (2018).  As the basis for its adjustment, however,

Commerce pointed to the 17 percent output VAT rate applicable to Jacobi's foreign and

domestic sales and found that it was, thus, included in Jacobi's U.S. price.  *See id.*  The

court again remanded the adjustment, this time because Commerce's revised

explanation introduced an inconsistency between the calculation methodology (based

on output VAT) and the theory underlying the adjustment (unrefunded input VAT).  *Id.* at

1341-44.  Pointing to the record on remand, the court further instructed:

> [t]o the extent that Commerce continues to justify the adjustment as
> accounting for irrecoverable VAT defined as unrefunded <u>input VAT</u>,
> Commerce must address record evidence demonstrating that Jacobi, in
> fact, recovers the input VAT it incurs by the offset it takes before remitting
> the output VAT it collects. . . .

> On the other hand, if Commerce asserts that the adjustment is based on
> an export tax due to Jacobi's collection of output VAT, Commerce must (a)
> address the record evidence regarding Jacobi's offset for input VAT paid
> on inputs taken against the output VAT collected, and (b) explain why the
> VAT adjustment is properly made on the basis of an estimated customs
> value instead of the FOB value on which the PRC assesses it.

*Id.* at 1342-43 (internal citations omitted).

In addition to reconsidering its VAT adjustment in accordance with *Jacobi (AR7) I*

and *Jacobi (AR7) II*, in a subsequent order, the court instructed Commerce to include in

its redetermination consideration of *Aristocraft of Am., LLC v. United States*, 42 CIT

___, 331 F. Supp. 3d 1372, 1379 (2018), in which that court posed several questions for

Commerce to address on remand regarding the evidentiary basis for the adjustment.

*See* Order (Aug. 22, 2018), ECF No. 120.  Commerce's explanation for the VAT

adjustment as discussed in *Aristocraft* differed significantly from the explanation offered

in this proceeding.

In its second remand redetermination in this action, Commerce changed the

basis for its VAT adjustment from irrecoverable VAT (i.e. unrefunded input VAT) to the

17 percent output VAT imposed on foreign and domestic activated carbon sales.  2nd

Remand Results at 30-31.  Commerce supported its revised explanation by way of

reference to a more recent iteration of Chinese VAT law, the relevance of which it had

not previously considered.  *Id.* at 27-28 & n.133 (citing Notice of the Ministry of Finance

and the State Administration of Taxation on VAT and Consumption Tax Policies for

Exported Goods and Labor Services ("2012 VAT Notice")); *see also* Jacobi's Second

Suppl. Sec. C Questionnaire Resp. (Nov. 25, 2015), Ex. C-6, PR 266, PRJA Tab 3 (the

2012 VAT Notice).  Commerce's revised explanation recognizes that Chinese VAT law treats products differently depending on their eligibility for an export VAT refund.  *See id.* at 26-30.

Pursuant to that law, companies that produce exported goods that are *ineligible* for an export VAT rebate do not incur a reduction in the input VAT amount credited against the output VAT.  *See* 2nd Remand Results at 29-30.  Export sales of such goods are treated as domestic sales and are, thus, subject to the collection of output VAT.  *See id.* at 29-30 & n.136 (citation omitted); 2012 VAT Notice, Art. 7.2(1)).  In contrast, companies that produce exported goods that are *eligible* for a VAT rebate incur "a reduction in or offset to the input VAT that can be credited against output VAT" when the company calculates its net VAT payable amount.  2nd Remand Results at 27; *see also* 2012 VAT Notice, Art. 5.1(1).  Export sales of such products are not subject to output VAT; instead, these companies incur a reduction in the input VAT amount they may credit against the output VAT collected solely on domestic sales.  *See* 2nd Remand Results at 29.  That reduction in the input VAT credit represents "irrecoverable VAT."  *See id.* at 28-29.

In accordance with the foregoing description of Chinese VAT law, Commerce explained that activated carbon is one of the products that is ineligible for an export rebate.  Consequently, Commerce found that producers of activated carbon do not incur a reduction in the amount of input VAT creditable against output VAT.  *Id.* at 30; *see also* 2012 VAT Notice, Art. 7.1(1).  Instead, export sales of activated carbon are treated in the same manner as domestic sales and are subject to the collection of output VAT.

2nd Remand Results at 30 & n.141 (citations omitted).  Commerce concluded that it

previously erred in adjusting Jacobi's constructed export price by an amount purportedly

representing irrecoverable VAT.  *Id.* at 30-31.  Commerce nevertheless retained the

downward adjustment to Jacobi's U.S. price to account for the 17 percent output VAT,

which the agency concluded represented an "export tax, duty, or other charge imposed

by the exporting country on the exportation of the subject merchandise to the United

States" pursuant to section 1677a(c)(2)(B).  *Id.* at 31.  Commerce explained that

deducting output VAT from Jacobi's constructed export price ensured the calculation of

a tax-neutral dumping margin because normal value in a nonmarket economy

proceeding is based on the factors of production, which are VAT-exclusive.  *Id.* at 30 &

n.139.

Commerce further noted that certain questions raised by the *Aristocraft* court

concerning the calculation of irrecoverable VAT were now irrelevant to Commerce's

adjustment in this case.  *Id.* at 31-32.  Additionally, in response to the court's instruction

that any assessment based on output VAT should include consideration of record

evidence regarding Jacobi's ability to offset the output VAT with input VAT, *see Jacobi

(AR7) II*, 313 F. Supp. 3d at 1343, the agency explained that "Commerce's adjustment

is not intended to account for the total amount of net VAT creditable," 2nd Remand

Results at 34.  Rather, pursuant to the *Methodological Change*, "when the 'export tax,

VAT, duty, or other charge [is] a fixed percentage,' Commerce 'will adjust the export

price or constructed export price downward by the same percentage.'"  *Id.* at 35 (citing

*Methodological Change*, 77 Fed. Reg. at 36,483).

Commerce calculated the VAT adjustment pursuant to the following formula set forth in Chinese law:

output VAT = FOB * exchange rate / (1 + legal VAT rate) * legal VAT rate.

*Id.* at 36 & n.164 (citing Jacobi's Sec. C Questionnaire Resp. (Aug. 14, 2015) ("Jacobi's § CQR"), Ex. SC-18, CR 56, CRJA Tab 6; 2012 VAT Notice).  Commerce reconsidered its prior reliance on estimated customs values to calculate the adjustment and instead used Jacobi's entered values because those "are the FOB China port values used in the Chinese tax authorities' output VAT calculations."  *Id.* at 36 & n.165 (citation omitted). Commerce thus adjusted Jacobi's U.S. price downwards by the output VAT amount calculated using the above formula and Jacobi's entered values.  *Id.* at 36.

Commerce further explained that because Jacobi's sales of subject merchandise are subject to output VAT, Jacobi's U.S. price "necessarily include[s]" output VAT.  *Id.* at 35.  In response to Jacobi's argument that Commerce had not shown its sales price to include output VAT because the invoice on the record of the remand proceeding does not reflect the collection of output VAT, Commerce pointed to Jacobi's questionnaire response explaining that its sales to foreign and domestic buyers are subject to 17 percent output VAT and Jacobi's calculation of its net VAT payable that includes amounts representing the collection of output VAT for each POR month.  *Id.* at 49 & nn.207-08 (citations omitted).

### C.  Commerce's Authority to Deduct Output VAT from U.S. Price

Jacobi contends that "Commerce's revised reasoning still fails to satisfy the statutory requirement for an adjustment" pursuant to section 1677a(c)(2)(B).  Jacobi's

Opp'n Cmts. at 13.  Jacobi does not, however, develop any particular argument that

output VAT does not fulfill the statutory criteria of an "export tax, duty, or other charge

imposed by the exporting country on the exportation of the subject merchandise to the

United States."  Nevertheless, the court recognizes that since it issued *Jacobi AR7 I*,

two opinions from the court have called into question Commerce's legal authority to

adjust export price or constructed export price to account for VAT (whether

irrecoverable or not) pursuant to 19 U.S.C. § 1677a(c)(2)(B).  *See Qingdao Qihang Tyre*

*Co., Ltd. v. United States*, 42 CIT ___, ___, 308 F. Supp. 3d 1329, 1338-47 (2018);

*China Mfrs. Alliance, LLC v. United States*, Slip Op. 19-7, 2019 WL 221237, at *4-8 (CIT

Jan. 16, 2019).  The court does not find those opinions persuasive and declines to

follow them.

        In *Qingdao* and *China Manufacturers*, the court, upon reviewing the statute in its

current form and as enacted prior to the adoption of the Uruguay Round Agreements

Act ("URAA"),[17] concluded, pursuant to *Chevron* prong one, that section 1677a(c)(2)(B)

is unambiguous and does not permit Commerce to adjust export price or constructed

export price for VAT imposed on export sales indirectly through an input VAT that

becomes irrecoverable or, by extension, directly through an output VAT.  *Qingdao*, 308

F. Supp. 3d at 1338-42, 1346; *China Mfrs.*, 2019 WL 221237, at *4-8.  The court

characterized VAT as a domestic tax that is distinct from an export tax imposed on the

---

[17] On December 8, 1994, Congress enacted the URAA, including section 1677a in its
current form. *See* Uruguay Round Agreements Act, Pub. L. No. 103–465, § 223, 108
Stat. 4809, 4876 (1994).

exportation of finished goods.  *See Qingdao*, 308 F. Supp. 3d at 1339, 1341, 1345;

*China Mfrs.*, 2019 WL 221237, at *6.  The court reasoned that an "export tax, duty, or

other charge" is "limited to one that is 'imposed by the exporting country on the

exportation of the subject merchandise to the United States,'" *Qingdao*, 308 F. Supp. 3d

at 1343 (quoting 19 U.S.C. § 1677a(c)(2)(B)) and is, thus, "by definition" not included "in

the home-market price," *id.*; *see also China Mfrs.*, 2019 WL 221237, at *4.

Previously, when considering Commerce's irrecoverable VAT theory for the

adjustment, this court held that "the catchall phrase 'other charge' captures any financial

obligation *provided* it is 'imposed by the exporting country on the exportation of the

subject merchandise,' regardless of whether the imposing country explicitly labels the

charge as one pertaining to exports."  *Jacobi (AR 7) I*, 222 F. Supp. 3d at 1186-87

(emphasis added).  In other words, the court considered "other charge" inherently

ambiguous and Commerce reasonably interpreted the phrase to encompass

irrecoverable VAT.

Upon Commerce's further consideration of the record and recognition that, with

regard to activated carbon, China simply imposes an output VAT on domestic <u>and</u>

<u>export</u> sales, the issue is now whether Commerce may apply the statute, 19 U.S.C.

§ 1677a(c)(2)(B), to a VAT that is equally applicable to domestic and export sales.  This

court determines that section 1677a(c)(2)(B)'s reference to "export tax[es], dut[ies], or

other charge[s] imposed by the exporting country on the exportation of the subject

merchandise" is ambiguous as to whether the statute applies to such assessments

imposed <u>solely</u> upon export sales or assessments imposed upon sales <u>at the time of</u>

export, regardless of whether the assessment is also applied to domestic sales.  *But cf.*

*Qingdao*, 308 F. Supp. 3d at 1343; *China Mfrs.*, 2019 WL 221237, at \*4.

The notion that the imposition of a tax, duty or other charge that is generally

applicable to both domestic and export sales does not alone preclude it from providing

the basis for an adjustment pursuant to section 1677a(c)(2)(B) finds support in the U.S.

Supreme Court's Export Clause jurisprudence.  The Export Clause provides: "No Tax or

Duty shall be laid on Articles exported from any State."  U.S. Const., Art. 1, § 9, cl. 5.  In

*United States v. International Business Machines Corp.* ("*IBM*"), the Court held that the

Export Clause bars the imposition of a generally applicable federal tax on goods in

export transit, even if the tax is nondiscriminatory and equally applicable to non-export

transactions.  517 U.S. 843, 845, 863 (1996); *see also United States v. U.S. Shoe*

*Corp.*, 523 U.S. 360, 363, 370 (1998) (holding that a harbor maintenance tax collected

from exporters, importers, and domestic shippers and imposed at the time of loading for

exports and unloading for other shipments violated the Export Clause as applied to

exports).  While the context in which those cases arose is arguably distinct,

notwithstanding any such distinctions, *IBM* and *U.S. Shoe* support the proposition that a

statutory reference to an export tax, duty, or other charge imposed upon exportation

may include such a tax, duty or other charge also imposed on domestic sales.

The court now turns to consideration of whether Commerce's interpretation of

section 1677a(c)(2)(B) was reasonable when applied to China's output VAT in this case.

Here, Commerce interpreted section 1677a(c)(2)(B) to permit a reduction to EP/CEP in

order to achieve a tax neutral comparison between EP/CEP and normal value, *see* 2nd

Remand Results at 30 & n.139, and such an interpretation, as discussed more fully

below, was reasonable.

As an initial matter, it is important to bear in mind that here, normal value is *not*

based on home-market (i.e., domestic) sales prices, but is based on the respondent's

factors of production and corresponding surrogate values, which are determined on a

tax-exclusive basis.[18]  In such a case, the principle that dumping margin calculations

should be tax-neutral supports Commerce's adjustment.[19]

The Federal Circuit recognized more than two decades ago:

> Buried in the language of statute and case law, and obscured by the fog of
> litigation, is a simple policy issue: whether Congress, in the Tariff Act of
> 1930 (the Act), precluded Commerce from determining dumping margins
> in a tax-neutral fashion.

*Federal Mogul Corp. v. United States*, 63 F.3d 1572, 1577 (Fed. Cir. 1995).  The

question, then, is whether Congress, when it did not substantively alter section 1677a in

---

[18] In a proceeding involving a market economy country, a comparable tax-neutral comparison would be achieved by reducing the normal value for "taxes imposed directly upon the foreign like product . . . which have been rebated, or which have not been collected, on the subject merchandise, but only to the extent that such taxes are added to or included in the price of the foreign like product."  19 U.S.C. § 1677b(a)(6)(B)(iii).
[19] Indeed, the *Qingdao* court recognized that Congress intended for Commerce to deduct export taxes from U.S. price in order to "achieve a tax-neutral comparison [with] normal value" in a market economy proceeding precisely because an export tax is not included in the home-market or comparison market price used to calculate normal value.  308 F. Supp. 3d at 1342-43.  So too here, output VAT is not included in the surrogate values used to calculate normal value and, thus, notwithstanding the facts that output VAT is assessed on domestic sales of activated carbon and this is a nonmarket economy proceeding, the same principle of tax neutrality supports Commerce's deduction of output VAT from U.S. price.

the URAA,[20] intended to prohibit Commerce from using that provision to achieve tax

neutrality in nonmarket economy cases?  This court can find no such intention.

First, the pre-URAA version of the statute clearly permitted Commerce to make

tax-neutral dumping calculations.  Whether it was through adjustments to foreign market

value or purchase price/exporter's sales price, *Federal Mogul* confirms that "one thing is

clear[:] . . . in administering the Act, [Commerce] over the years has pursued a policy of

attempting to make the tax adjustment called for by the Act tax-neutral."  63 F.3d at

1580 (further holding that nothing in the pre-URAA version of section 1677a precluded

Commerce from achieving tax-neutrality in its administration of the provision requiring

an upward adjustment to U.S. price to account for taxes included in the home market

sales price and rebated or exempted in the context of exports sales).[21]  Commerce's

policy accords with the principle that differences in sales prices due to differential tax

treatment between the home market and export market "does not constitute unfair

pricing behavior" but, rather, "is a difference created by forces outside the control of the

---

[20] The Statement of Administrative Action accompanying the URAA explained that although Congress gave new labels to "purchase price" and "exporter's sale price," now "export price" and "constructed export price," respectively, the adjustments to those prices pursuant to section 1677a were unchanged.  *See Qingdao*, 308 F. Supp. 3d at 1339-40 (citing Uruguay Round Agreements Act, Statement of Administrative Action , H.R. Doc. No. 103–316, vol. 1, at 822–23 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4163) ("SAA")).  Congress likewise renamed "foreign market value" to "normal value." SAA at 820, 1994 U.S.C.C.A.N. at 4161.  The SAA is the authoritative interpretation of the statute. 19 U.S.C. § 3512(d); *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1345 n.7 (Fed. Cir. 2002).

[21] At least as early as 1991, Commerce adjusted export price to enable a tax-neutral comparison to foreign market value.  *See* U.S. Dep't Commerce, Int'l Trade Admin., Import Admin., Antidumping Manual Chapter 7, pp. 8-10 (1991).  As noted, the URAA did not affect any substantive change to these adjustments.  *See supra*, note 20.

competitor, and does not involve the idea behind the antidumping act," which is to prevent unfair competition from dumping.  *Id.* at 1575 (citation omitted).

Second, the suggestion that Congress, by providing for adjustments to normal value or EP/CEP, is legislating adjustments to increase or decrease the margin of dumping is unsupported.  *But cf., e.g.*, *Qingdao*, 308 F. Supp. 3d at 1341, 1343 (discussing congressional intent to impact the dumping margin through certain adjustments).  To the contrary, Congress, when it enacted the URAA, intended to ensure that Commerce could continue to make the adjustments to normal value and EP/CEP necessary in order to place both prices, to the extent possible, on the same basis, permitting a "fair, 'apples-to-apples' comparison."  *Maverick Tube Corp. v. United States*, 861 F.3d 1269, 1274 (Fed. Cir. 2017) (quoting *Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995)); *see also* SAA at 827, 1994 U.S.C.C.A.N. at 4166 (noting that a new statutory provision regarding deductions from normal value to account for indirect taxes represents a change from the pre-URAA statute that accounted for indirect taxes through an upward adjustment to export price, which change "is intended to ensure that dumping margins will be tax-neutral").  Typically, these adjustments lead to ex-factory prices, packed in the same manner, and on the same tax basis.  *See* SAA at 827.

Third, as discussed above, there is no indication that before 2012, Commerce (or Congress) considered section 1677a to be inapplicable in NME cases.  *See Methodological Change*, 77 Fed. Reg. at 36,482; *Pure Magnesium from Russia*, 60 Fed. Reg. at 16,448 (noting that, in NME cases, "pecuniary aspects of internal transactions

are considered meaningless and thus ignored").  Rather, Commerce considered itself

unable to apply the provision in NME cases because "pervasive government

intervention . . . precluded proper valuation of taxes paid by NME respondents to NME

governments."  *Methodological Change*, 77 Fed. Reg. at 36,482.  Thus, while it may be

the case that, all other things being equal, a dumping margin calculated before

Commerce's policy shift would be lower than a margin calculated inclusive of an

adjustment pursuant to section 1677a(c)(2)(B), there is nothing to indicate that the latter

is not in accordance with law.  Instead, the latter margin calculation simply includes an

additional data point that Commerce was unable to include in the former.

Finally, returning to the "policy issue" identified in *Federal Mogul*, adjusting

EP/CEP for VAT imposed on export sales allows Commerce to calculate a tax-neutral

dumping margin when normal value is calculated exclusive of VAT.  In this case, as

discussed in more detail below, the constructed export price reported by Jacobi includes

17 percent output VAT imposed by the Chinese government, whereas the normal value,

to which it is to be compared, is determined using surrogate values that are tax-

exclusive.  *See* 2nd Remand Results at 30 & n.139.  To interpret section 1677a(c)(2)(B)

as unambiguously barring Commerce from adjusting EP/CEP for these taxes when

comparing those prices to a tax-exclusive normal value would be to require that it

understate the margin of dumping.  The court finds no support for such a requirement in

the language of the statute.  Thus, Commerce's conclusion that China's output VAT is

an "export tax, duty, or other charge imposed by the exporting country on the

exportation of the subject merchandise" is a permissible interpretation of section

1677a(c)(2)(B), 2nd Remand Results at 31, and the court now turns to Jacobi's

arguments that the adjustment is unsupported by substantial evidence.

### D.  Commerce's Adjustment is Supported by Substantial Evidence

Jacobi argues that Commerce's determination that 17 percent output VAT is

included in Jacobi's constructed exported price lacks substantial evidence.  *See*

Jacobi's Opp'n Cmts. at 13-14, 16.  According to Jacobi, the existence of a "legal

requirement" to collect output VAT on its U.S. sales is not evidence that it includes 17

percent output VAT in sales prices to the United States.  *Id.* at 16.  Jacobi points to its

sales documentation submitted on the record and notes the lack of any reference to

output VAT.  *See id.* at 13-14 (citing Jacobi's Sec. A Questionnaire Resp. (July 15,

2015) ("Jacobi's § AQR"), Ex. A-17, CR 27, 30, CRJA Tab 5).  Jacobi further contends

that Commerce has ignored the court's instruction to address evidence that Jacobi

offsets paid input VAT against the output VAT due.  *Id.* at 14.  Jacobi also contends that

*Aristocraft* remains relevant and Commerce erred in failing to address the opinion.  *Id.*

at 15-16.

The Government contends that Jacobi's reporting of its output VAT collection

obligations represents substantial evidence that output VAT was included in its U.S.

prices and Jacobi's sales documentation does not detract from the substantiality of that

evidence.  Def.'s Reply Cmts. at 16-17.  The Government further contends that

Commerce properly discounted the relevance of Jacobi's ability to offset input VAT from

output VAT and its calculation of a net VAT payable amount because Commerce's

margin calculations are intended to account for the amount of VAT included in U.S. price, not Jacobi's net VAT burden.  *Id.* at 17-18.

Calgon contends that because "the cost of output VAT falls on the buyer of the good, not on the [seller]," Def.-Ints.' Reply Cmts. at 14 (quoting 2nd Remand Results at 27), it is "necessarily included in Jacobi's price," *id.*  Calgon further contends that Commerce adequately addressed the court's questions regarding the relationship between input VAT and output VAT and the relevance of the *Aristocraft* opinion in light of activated carbon's treatment under Chinese VAT law.  *Id.* at 15-16.[22]

The court sustains Commerce's VAT adjustment.  The absence of a line item for output VAT on Jacobi's sales documents is not dispositive and the record supports Commerce's determination that Jacobi's export prices include output VAT.  *See Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984) (the possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence) (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966)).

Here, Jacobi concedes that its U.S. sales were subject to the collection of 17 percent output VAT pursuant to the 2012 VAT Notice.  *See* Jacobi's Opp'n Cmts. at 16; 2012 VAT Notice, Art. 7.2(1).  Jacobi suggests, however, that it calculates the net VAT payable amount *as if* it collected output VAT on U.S. sales, but that it does not actually collect output VAT on those sales. *See* Jacobi's Opp'n Cmts. at 16.  In making this

---

[22] CAC did not comment on this issue.

claim, Jacobi points to no affirmative evidence demonstrating that the FOB China port value reflected in its sales documents is output VAT-exclusive.  *See* Jacobi's § AQR, Ex. A-17 at ECF p. 94.  The record reasonably supports Commerce's conclusion that Jacobi's U.S. prices included output VAT—regardless of whether Jacobi itemized that charge in its sales documents.

Moreover, contrary to Jacobi's arguments, *see* Jacobi's Opp'n Cmts. at 14-15, Commerce did not impermissibly base its adjustment on the contemporaneous Chinese law while ignoring evidence of Jacobi's net VAT payment.  The statute directs Commerce to make adjustments based on certain amounts included in U.S. price, not amounts remitted to the subject nonmarket economy government.[23]  *See* 19 U.S.C. § 1677a(c)(2)(B).

In sum, Commerce's redetermination on this issue complies with the court's remand instructions set forth in *Jacobi (AR8) I* and the agency's deduction of output VAT from Jacobi's constructed export price is lawful and supported by substantial evidence.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's 2nd Remand Results are remanded for Commerce to reconsider its surrogate country selection as well as the surrogate values for

---

[23] The court also notes that Jacobi's argument that it "only <u>pays</u> the Chinese government the 'net' VAT amount," Jacobi's Opp'n Cmts. at 14, is inaccurate.  While the net VAT payment may represent Jacobi's direct VAT payment to the Chinese government, Jacobi is simply reducing the output VAT it collected by the input VAT it has already paid to the Chinese government, albeit indirectly via its purchases of inputs.

carbonized material and hydrochloric acid, as set forth in Discussion Section I above; it is further

    **ORDERED** that Commerce's 2nd Remand Results are sustained with respect to the agency's VAT adjustment, as set forth in Discussion Section II above; it is further

    **ORDERED** that, in the event Commerce amends the antidumping margin assigned to Jacobi, Commerce reconsider the separate rate assigned to non-mandatory respondents; it is further

    **ORDERED** that Commerce shall file its second remand results on or before June 3, 2019; it is further

    **ORDERED** that the deadlines provided in USCIT Rule 56.2(h) shall govern thereafter; and it is further

    **ORDERED** that any opposition or supportive comments must not exceed 6,000 words.

/s/     Mark A. Barnett
Mark A. Barnett, Judge

Dated: March 5, 2019
    New York, New York